## IN THE MATTER OF LEON ROBERT LEWIS, A JUVENILE DELINQUENT.

Argued December 1, 1952—Decided January 19, 1953.

218

*Mr. Warren Dixon, Jr.*, argued the cause for appellant.

*Mr. Paul T. Huckin* argued the cause for respondent State of New Jersey (*Mr. Harry L. Towe,* attorney).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   Shortly after six o'clock in the morning of August 22, 1951, a clear, dry day, appellant, then 17 years old, was driving a car west along Route 4, East Paterson, with four other youths, all of whom were asleep, as passengers.  Mrs. Sarah Holms, on her way to her work, was standing near a telephone pole on the east corner of Elizabeth Avenue waiting for a bus.  Mr. Walter Ruhren, also waiting for the bus, was standing in the middle of the block west of the intersection.  He saw the car three blocks away approaching from the east "coming along in a normal manner" though "going pretty fast."  When the car neared Elizabeth Avenue he saw it veer to the right, "he started toward the curb" "making a gradual turn right."  The car jumped the curb close to the place where Mrs. Holms was standing, hit her and crushed her to death against the telephone pole.  "The car bounced and made a turn," "flew across the street" "and hit the tree on the west corner of Elizabeth Avenue."  One of the sleeping boys, Martin Head, was killed.  The other boys, including appellant, were injured.

A minor under 18 who commits any act which is a misdemeanor when committed by a person of the age of 18 years or over may be adjudged guilty of an act of juvenile delinquency.  *N. J. S.* 2*A* :4–14(1) (*a*).  Complaint was made to the Bergen County Juvenile and Domestic Relations Court that the deaths of Mrs. Holms and Martin Head were caused by appellant's careless and heedless operation of the automobile in willful or wanton disregard of the rights or safety of others, an offense constituted a misdemeanor by *R. S.* 2 :138–9, since superseded by *N. J. S.* 2*A* :113–9.  After trial the final judgment on appeal was entered.  It adjudges appellant guilty of an act of juvenile delinquency and commits him to the Annandale Reformatory upon a finding that the deaths of Mrs. Holms and the Head boy were caused by

appellant's driving of the car in the manner interdicted by R. S. 2:138–9. His appeal to the Appellate Division is here upon certification of our own motion.

The principal challenge is to the sufficiency of the proof to sustain the finding of the commission of the offense. The State on its brief concedes that the proof of the offense "should be at least as strong as would be required in ordinary criminal proceedings," but *cf. State ex rel. Berry v. Superior Court*, 139 *Wash.* 1, 245 *Pac.* 409, 45 *A. L. R.* 1530 (*Sup. Ct.* 1926).

■■ There was no direct testimony establishing exactly what appellant did or omitted to do to cause the car to leave the road. The evidence of his inculpatory conduct is entirely circumstantial. Circumstantial evidence of course suffices, indeed often is "more certain, satisfying and persuasive than direct evidence." *State v. O'Connor*, 134 *N. J. L.* 536, 539 (*Sup. Ct.* 1946) ; *State v. Goodman*, 9 *N. J.* 569 (1952). In view of the State's concession, the real question, *cf. State v. Goodman, supra*, is whether the evidence, viewed in its entirety, was such that the trial judge could properly find therefrom, beyond reasonable doubt, that the deaths were the result of appellant's careless and heedless operation of the car in willful or wanton disregard of the rights or safety of others. Our review of the testimony satisfies us that the proofs are sufficient to support the conclusion of the trial judge.

■■ The offense condemned by *R. S.* 2:138–9 may be committed by the driver of a motor vehicle who causes the death of another when there inheres in his driving the high probability of causing harm because of conditions known to him which actually impair, or potentially have the capacity to impair, his faculties for vigilance and care. It is not necessary to show ill will toward, or a positive intent to injure, another in order to establish that a motor vehicle was driven in willful or wanton disregard of the rights or safety of others. True, conduct which is willful or wanton, unlike conduct which is merely negligent, does import intent. 38

*Am. Jur., Negligence, sec.* 48, *p.* 692. However, the element of intent to·harm is supplied by a constructive intention as to consequences, which entering into the intentional act which produces harm, namely, the driving of the vehicle, the law imputes to the actor, so that conduct which otherwise would be merely negligent becomes, by reason of reckless disregard of the safety of others, a willful or wanton wrong. See *King v. Patrylow,* 15 *N. J. Super.* 429 (*App. Div.* 1951). The emphasis is upon the reckless indifference to consequences of the intentional act of driving the motor vehicle in the face of known circumstances presenting a high degree of probability of producing harm. *State v. Hedinger,* 126 *N. J. L.* 288 (*Sup. Ct.* 1941), affirmed 127 *N. J. L.* 564 (*E. & A.* 1942); *State v. Linarducci,* 122 *N. J. L.* 137 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 228 (*E. & A.* 1939); *State v. Gooze,* 14 *N. J. Super.* 277, 286 (*App. Div.* 1951); *Annotation,* 160 *A. L. R.* 515.

The five boys held summer jobs at a Catskill Mountain resort some 100 miles from New York City. Appellant had driven his companions down to the city after work the previous evening, arriving after midnight. His companions went separate ways after agreeing to meet him at Times Square at five a. m. for the return trip. They were due back at work about eight o'clock. Appellant testified that he spent the hours from two to five sleeping in the car. The other boys, however, apparently had no sleep at all. The car left Times Square about a quarter past five. They stopped for gasoline and a change of oil before leaving the city. One of the boys asked appellant at the service station, "How about me driving if you are tired" and appellant answered "No one drives this car but me."

The three in the back seat were asleep before the George Washington Bridge was reached. Appellant's fourth companion, Harry Call, sitting beside him in the front seat, stayed awake until after appellant had driven a few miles in New Jersey beyond the bridge. When they left Times Square the other boys had urged appellant to hurry so that

they would get back to work on time. Call testified that nevertheless as they sped along "about 60 to 65" he said to appellant, "If you were tired, we were hurrying to get back to work, that is why we were going so fast, I said we could afford to slow down or pull over to the side for a while,"— but appellant made no response. Call then fell asleep. Appellant testified that he had no recollection of Call's remark. He at first was positive in his denial that he had fallen asleep or dozed at the wheel, but finally said that he really did not know whether he did or not. Significantly, however, he testified that he had no memory whatever of any event or place after passing a boat house some distance before reaching the scene of the mishap.

Plainly it was open to the trial judge to conclude upon the evidence that appellant, knowing that he had once driven the car a long distance that night and lacked adequate sleep and rest, but feeling impelled to press on to get back to work on time, intentionally chanced driving the car at high speeds notwithstanding the evident risk that his senses were or would be so dulled as to leave him, as became clearly the case, without any appreciation or awareness of events or circumstances around him, and that it was his reckless folly in driving under those known conditions which brought about the deaths of Mrs. Holms and Martin Head. Appellant's proffered explanations that either the right front tire blew out or that he may have suffered a dizzy spell of the kind he had occasionally experienced after strenuous exercise, do not exculpate him. The first has no substance. A photograph in evidence taken immediately after the mishap shows the tire to be inflated. As to the second, while the suggestion of his seizure with a dizzy spell was pure conjecture on his part, if such was the case, he knew his tendency to such spells, and his driving, particularly at such high speeds, might certainly be considered an act of recklessness.

It is then urged that the commitment of appellant to Annandale Reformatory was unjustified and offends the spirit and purpose of the Juvenile and Domestic Relations

Court Law "to secure for each child coming under the jurisdiction of the juvenile and domestic relations court such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the state." *N. J. S.* 2A:4–2. It is argued that the revocation of appellant's driver's license and his placement upon probation would have sufficed to impress the boy "with the serious consequences of his unfortunate act or failure to act."

█ It is true that the statutory policy for the treatment of juvenile offenders is directed to their rehabilitation for useful citizenship through reformation and education and not to their punishment even when the offense underlying the adjudication of juvenile delinquency is of a kind which when committed by an older person would merit indictment, conviction and punishment. *State v. Goldberg,* 124 *N. J. L.* 272 *(Sup. Ct.* 1940), affirmed *sub nom. State v. Goldbert,* 125 *N. J. L.* 501 *(E. & A.* 1940). The statute expressly saves the juvenile from the stigma of criminality by providing that he shall not be "deemed a criminal" and that his adjudication of juvenile delinquency shall not "operate to impose any of the civil disabilities ordinarily imposed by conviction," *N. J. S.* 2A:4–39.

█ However, the statute also grants discretion to the trial judge to determine whether the objectives of the act will best be served in any case by substituting restraint and care by the public authorities for that which the child would usually receive from its parents; the judge "on proper cause shown" may commit the juvenile to a reformatory, *N. J. S.* 2A:4–37. We cannot say in light of the circumstances surrounding appellant's offense that proper cause is lacking for the instant judgment of commitment. Moreover, such a judgment is not ordinarily revisable by an appellate court where the trial judge's discretion is exercised within the limits laid down by the statute. *Cf. State v. Newman,* 128 *N. J. L.* 82 *(Sup. Ct.* 1942).

In compliance with *R. S.* 30:4–152, as amended by *L.* 1951, *c.* 335, *p.* 1176, the court did not fix or limit the duration of appellant's commitment to the reformatory. Nor was the retention by the court of jurisdiction over appellant stated in the order of commitment, and therefore, under *Rule* 6:7–13, such jurisdiction is relinquished. Accordingly, the board of managers of the reformatory may terminate appellant's term of service at a time of the board's selection in accordance with its formally adopted rules and regulations, but as provided by *R. S.* 30:4–152 may not detain appellant for a period in excess of the maximum term provided by law for the commission of an offense under *R. S.* 2:138–9.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.