THE STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF PAUL STEENBACK, JUVENILE-APPELLANT.
[Juvenile Court Docket No. 62298]

THE STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF WILLIAM CLARK, JUVENILE-APPELLANT.
[Juvenile Court Docket No. 62299]

THE STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF GERARD GENOVESI, JUVENILE-APPELLANT.
[Juvenile Court Docket No. 62300]

Argued November 22, 1960—Decided January 23, 1961.

90

Mr. *George K. Meier, Jr.* argued the cause for the appellants (Mr. *William O. Barnes, Jr.,* attorney for appellant Paul Steenback; Mr. *Samuel Levin,* attorney for appellant Gerard Genovesi).

Mr. *Brendan T. Byrne,* Essex County Prosecutor, argued the cause for the respondent (Mr. *John W. Hayden, Jr.,* on the brief).

The opinion of the court was delivered by

Jacobs, J.  A juvenile delinquency complaint in the Essex County Juvenile Court charged that the appellants Gerard Genovesi, William Clark and Paul Steenback assaulted and robbed Thomas Taurosa and that Taurosa died as a result of the injuries inflicted during the assault and robbery. After hearings during which extensive testimony was taken, the court adjudged that the appellants were juvenile delinquents and committed Genovesi to the New Jersey State Reformatory at Annandale and Steenback and Clark to the State Home for Boys.  They appealed to the Appellate Division and we certified the proceedings on our own motion.

In accordance with *R. R.* 6:9–1 the county prosecutor was notified of the complaint, counsel was retained by Genovesi and was assigned to Clark and Steenback and a stenographic record was made of the proceedings.  Several witnesses including Mrs. Naddeo and Mr. Stabile testified with respect to the assault and robbery, Dr. Albano testified with respect to his autopsy and the cause of death, and detailed written statements by the appellants admitting their participation in the assault and robbery were received in evidence.  The appellants did not testify but did produce as witnesses, Dr. Goldberg who gave his expert opinion based on Dr. Albano's testimony and autopsy as to the cause of death, and Officer De Angelis who had apparently answered the call for the police on the night of the assault and robbery and whose testimony was introduced to attack the credibility of Mr. Stabile's testimony.

Mrs. Naddeo testified that on June 26, 1959 at about 9 p. m. she saw four boys near Crane Street and Summer Avenue in Newark and as a man approached two of them "started beating him up" and the "other two followed."  She saw the man go down and she kept shouting "a mugging." When the headlights of a passenger car lighted the scene she saw "four boys kicking the man" while he was on the ground.  Later she saw the man get up and stagger although he had not been staggering when she had observed him

before the attack. Mr. Stabile testified that on June 26, 1959 at about 9 P. M. he saw Mrs. Naddeo near Crane Street and Summer Avenue; she directed his attention to what the boys were doing and he saw them run away; he went over to where "the commotion was going on" and saw a man lying on his back; the man was bleeding, his clothes were soiled and ripped and "his pockets were inside out"; Mr. Stabile told his wife to call the police and he asked the man where he lived; the man told him he lived at 15 Crane Street and that he was going home; when he saw the man staggering and heading away from 15 Crane Street he started him in the right direction and then lost sight of him; and when the police arrived he told them about the incident and that the beaten man had said he was going home to 15 Crane Street.

Joseph Taurosa, a brother of the decedent Thomas Taurosa, testified that he lived with his brother at 15 Crane Street; that on June 26, 1959 at about 9:30 P. M. his brother came home with his clothes "all messed up" and with "blood around his face"; and that his brother's pockets were "sticking out" and he told him he had been "mugged" but that he did not want any help. Joseph left the house the next morning and when he returned at about 5:30 P. M. he found his brother sitting on his bed and he assisted him to the bathroom. He handed him a glass containing soda but Thomas dropped it and began trembling. Joseph left the house to call his father and when his father arrived they carried Thomas into bed and called the emergency squad. Michael Taurosa, the decedent's father, testified that after talking to his son Joseph he visited Thomas at about 1 P. M. on June 27 at 15 Crane Street. Thomas was sleeping but he awakened him and was told that "four guys jump on him and knock him down." Thomas told his father that he did not want a doctor nor did he want to go to a hospital but that he intended to go down to the drug store to "buy a bottle to clean up himself." Michael saw that Thomas was "all messed up" and that there were marks on his

face. He left after helping Thomas put on a clean pair of pants and did not return until about 6 P. M. when Joseph called him and they carried Thomas into bed and called the emergency squad. Police Officer McGuire testified that he and Officer Patella responded to the call at 6:37 P. M. on June 27 and when they arrived at 15 Crane Street they found Thomas Taurosa "lying in bed apparently dead." They notified headquarters to send a doctor who responded and pronounced him dead.

Police Officers Walter and Brent and Essex County Prosecutor's detective Neidorf testified that they were assigned to investigate the matter and took statements, in which the appellants set forth in detail their participation in the assault and robbery of Thomas Taurosa, and photographs in which the appellants pointed to various scenes involved in the events of June 26, 1959. In his statement Genovesi stated that on June 26, he, Clark, Steenback and a fellow named Harry Pickels were near the Old Mill Tavern where they saw a drunken man come out; Pickels said that the man "must have money on him tonight because it's Friday night" and that he could use some money "come on let's follow him"; Genovesi "bumped the man" with his right shoulder and he fell underneath the steps of a brick factory on Crane Street; then Pickels, Clark and Steenback ran over and "all three began kicking this man"; "I was trying to hold the man down, he was struggling to get up" and "after Pickels kicked him the man became quiet"; "Pickels began going through his pockets" and "the man tried to get up again and Pickels kicked him near the face and the man lay quiet again"; "then Pickels took the wallet from the man's pocket"; "I looked through the wallet, there was no money in the place for bills"; "I opened a zipper and found four ten dollar bills"; "I gave a ten dollar bill to each of the fellows and kept one for myself." In his statement Clark said that as Jerry (Genovesi) was going through his pockets "the man moved and I kicked him about four times on the body." "Pickels and Irish (Steenback) kicked

the man also when he was lying on the ground." In his statement Steenback said that "when Jerry was going through the man's pockets the man tried to get up, Pickels kicked the man with his foot, first in the head and then a couple of times in the ribs or body"; "I kicked the man once in the left shoulder; then Jerry Genovesi ripped the man's pants pocket, the rear pocket and got the man's wallet."

Dr. Albano, Chief Medical Examiner of Essex County, testified that he had performed an autopsy on the body of Thomas Taurosa; he found lacerations and abrasions, cracked ribs, a chest bruise, a lacerated spleen and 1500 c.c. of blood in the abdominal cavity; he expressed the view that the laceration to the spleen had resulted from trauma and that internal hemorrhage from the lacerated spleen had produced shock which brought on Taurosa's death; and he stated that he found no diseased condition in the body which would or could have contributed to the lacerated spleen. The appellants produced Dr. Goldberg, pathologist at the Presbyterian Hospital, who expressed the view that Taurosa had not died as the result of shock produced by the hemorrhage resulting from the lacerated spleen but that the "primary cause of his death was a cardiac condition." Dr. Goldberg never examined Taurosa's body but based his opinion on Dr. Albano's autopsy report and testimony. The autopsy report did indicate heart impairment but Dr. Albano's testimony clearly evidenced his conviction that this played no part in Taurosa's death. In response to an inquiry as to whether the lacerated spleen contributed to Taurosa's death Dr. Goldberg expressed the view that it "might have" but "you can't tell."

The appellants also produced Officer De Angelis who testified on direct examination that on June 26, 1959 between 9:15 and 9:30 P. M. he went to Summer Avenue and Crane Street in response to a call that someone was sick or had been injured and that when he arrived he was told that the police had been called because a man had been sitting on the sidewalk "slumped over but that he had walked away."

The officer testified further that he was not told anything about a "mugging" or about the address where the man had gone; on cross-examination the officer acknowledged that the report from which he testified on direct examination was not prepared until July 15, 1959 and that he could not recall how many other police calls he had received in the interim. After the officer completed his testimony, counsel for the appellants announced that they had advised the appellants and their parents that if the appellants did not testify the court was at liberty to infer that they could not deny the truth of their statements to the police and that it had nonetheless been concluded, upon the advice of counsel and with the approval of the appellants and their parents, that the appellants should not testify.

After denying motions for dismissal the Juvenile Court rendered its decision. It found beyond reasonable doubt that "these three boys, with another, assaulted and robbed Taurosa" and that "as a result of such assault in which all three boys before the court admitted participation, said Thomas Taurosa died." It adjudged that the complaint of juvenile delinquency had been sustained and then said:

"In a degree like but in some respects unlike the criminal court, this Court is chargeable with making a further judgment in the best interests of these boys and the State. Fortunately, the County of Essex has made available to this Court the use of psychiatric facilities, a detention center staffed by professionals, and a competent probation staff. Before making a further decision insofar as how these boys might best be treated from the standpoint of rehabilitation, the Court is going to direct that there be submitted to it a complete social investigation by the Probation Department. In addition thereto, the Court is going to ask that there be a psychiatric examination likewise to be submitted to the Court. When both of these are made available to the Court, the Court will set the matter down so that counsel and the Prosecutor, if the Prosecutor so desires, may appear before the Court to consider such further forms of judgment that ought to be rendered in this matter."

After reviewing the reports from the Probation Department and the Guidance Clinic, the Juvenile Court on Octo-

ber 29, 1959 committed Genovesi to the New Jersey State Reformatory at Annandale and Clark and Steenback to the State Home for Boys. In support of their appeals from the orders of commitment the appellants have advanced in their brief the following points though not in the same order: (1) "*R. S.* 2A:4-37 is unconstitutional and of no force and effect"; (2) "without a specific finding of an intent to kill and that a killing in fact did occur, these juveniles can be guilty of nothing beyond a participation in a robbery and not of a homicide"; (3) "death was caused by an intervening cause, the acts of the decedent, and not the injuries inflicted by the juveniles so that the court below erred in making a finding that they committed a homicide as defined in Sections 2A:113-1 and 2A:113-2"; (4) "the finding was against the weight of the evidence"; and (5) "assigned counsel in this case should be allowed reasonable compensation."

New Jersey has long and properly differentiated between adult offenders who are subject to criminal court proceedings and child offenders who are subject to juvenile court proceedings which are conducted informally with rehabilitative supervision rather than retributive punishment in mind, and without indictment, trial by jury and other incidents of criminal causes. See *State v. Monahan,* 15 *N. J.* 34, 37 (1954); *In re Smigelski,* 30 *N. J.* 513, 520 (1959); cf. *State v. Van Buren,* 29 *N. J.* 548, 553 (1959); *State v. Smith,* 32 *N. J.* 501, 536 (1960). Juvenile Court proceedings have withstood constitutional attacks (*Ex Parte Newkosky,* 94 *N. J. L.* 314 (*Sup. Ct.* 1920); *State v. Goldberg,* 124 *N. J. L.* 272 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 501 (*E. & A.* 1940)) and the appellants do not here question the Juvenile Court's jurisdiction over them or the fairness of its procedures. See Paulsen, "Fairness to the Juvenile Offender," 41 *Minn. L. Rev.* 547 (1957); Blanton, "Juvenile Courts and the Constitutional Rights of Minors," 18 *Ala. Law.* 12 (1957); cf. *Note,* 11 *Rutgers L. Rev.* 641 (1957); *Note,* 50 *J. of Crim. L., C. & P. S.* 465 (1960). See also

Alexander, "Constitutional Rights in Juvenile Court," 46 *ABAJ* 1206 (1960).

N. J. S. 2A:4–14 vests jurisdiction in the Juvenile Court to hear and determine all cases of juvenile delinquency and it defines juvenile delinquency to include, *inter alia*, acts by persons under 18 which would constitute felonies, high misdemeanors, misdemeanors or other offenses if committed by persons over 18. N. J. S. 2A:85–4 provides that persons under 16 shall be deemed incapable of committing crimes. N. J. S. 2A:4–15 provides that if an offender is 16 or 17 and is an habitual offender or is charged with a heinous offense, then the Juvenile Court may transfer the case to the county prosecutor for criminal prosecution; it also provides that any juvenile of the age of 16 or 17 may demand presentment and trial by jury and, in such event, the case is to be referred to the county prosecutor for criminal prosecution. At the time of the assault on Taurosa, Steenback was a month short of 15, Clark had just passed his 15th birthday and Genovesi was 17. The Juvenile Court clearly had exclusive jurisdiction over Steenback and Clark; it also had jurisdiction over Genovesi who did not demand presentment and trial by jury as he might have under N. J. S. 2A:4–15 but, on the contrary, requested through his counsel and by his own signed statement that his case be heard in the Juvenile Court.

Although there were earlier decisions holding otherwise, it is now well settled that the Juvenile Court's jurisdiction extends to conduct which would constitute the crime of murder if committed by an adult. See *State v. Monahan, supra,* 15 *N. J.* 34; Annotation, *Homicide by juvenile as within jurisdiction of a juvenile court,* 48 *A. L. R. 2d* 663 (1956). In *Monahan* a 15-year-old boy participated with his father in a robbery during which his father killed two persons. The boy was indicted for murder but this court held that he was not so triable and remanded the matter to the Juvenile Court which thereafter exercised jurisdiction and ordered his commitment with a view towards rehabili-

tation and ultimate release when fit for social intercourse. See *In re Smigelski, supra*, 30 *N. J.*, at *p.* 527. In *Johnson v. State*, 18 *N. J.* 422 (1955), *certiorari* denied 350 *U. S.* 942, 76 *S. Ct.* 318, 100 *L. Ed.* 822 (1956), this court held that a juvenile who is committed for conduct which would constitute murder if engaged in by an adult, is not automatically entitled to release when he reaches 21. In *Smigelski* this court reaffirmed *Johnson* pointing out that "it would be most violative of public policy and contrary to the public welfare" to say that a juvenile who has engaged in conduct which would constitute murder if committed by an adult should be set free though it appears that he has not yet been rehabilitated to a point where he may safely "be turned loose on society." 30 *N. J.*, at *p.* 523. Compare *In re Smigelski's Petition*, 185 *F. Supp.* 283 (*D. C. D. N. J.* 1960) with *Application of Johnson*, 178 *F. Supp.* 155 (*D. C. D. N. J.* 1957).

After *Johnson* was decided the Legislature enacted *L.* 1957, *c.* 220 which amended *N. J. S.* 2*A*:4–37 to provide that where the Juvenile Court exercises its discretion to commit a juvenile offender, the commitment shall not continue beyond the date when the juvenile attains 21 except that where the "adjudication of juvenile delinquency is predicated upon an offense which, if committed by a person of the age of 18 years or over, would constitute any form of homicide as defined in sections 2*A*:113–1, 2*A*:113–2, 2*A*:113–4 and 2*A*:113–5 of the New Jersey Statutes, then the period of confinement shall be indeterminate and shall continue until the appropriate paroling authority determines that such person should be paroled but in such case the period of confinement and parole shall not exceed the maximum provided by law for such offense if committed by a person of the age of 18 years or over." It is this enactment which the appellants contend is unconstitutional but we are satisfied that their contention misconceives its purpose and effect and is not well taken. See *In re Smigelski, supra*, 30 *N. J.*, at *p.* 526.

The appellants mistakenly view the enactment as imposing a mandate on the Juvenile Court to commit a juvenile who has engaged in conduct which would constitute murder or manslaughter if engaged in by an adult. It is clear from a reading of the enactment in its entirety that it does not do so but leaves to the Juvenile Court the pre-existing alternatives of (1) placing the offender on probation to the chief probation officer of the county upon such terms as the court may deem to be to the best interests of the offender, or (2) committing the offender to a public institution established for the care, custody, instruction and reform of juvenile offenders, or to any other like institution to which commitment is authorized by law, or to the care, custody and control of the State Board of Child Welfare. See *N. J. S.* 2A:4–37. The appellants also mistakenly view the enactment as departing from the enlightened policy which is directed to the rehabilitation of juvenile offenders for useful citizenship through reformation and education rather than through punishment (*In re Lewis,* 11 *N. J.* 217, 224 (1953)) and as vesting in the paroling authority statutory power, unaccompanied by any express standard, to deal with the juvenile offenders in the same manner as adult offenders. The indefinite commitments of Steenback, Clark and Genovesi were directed towards their rehabilitation and they do not suggest here that they have already been rehabilitated and are now ready for release. Under the statute, the paroling authority will have the continuing responsibility of determining when they have been rehabilitated for useful citizenship under a standard consonant with and sympathetic to the modern philosophy underlying the treatment of juvenile offenders. In exercising that responsibility the paroling authority will be fully aware that it is concerned with juvenile rather than adult offenders and that "considerations of punishment or deterrence to others pertinent in deciding whether an adult criminal should be paroled" will have no proper place. See *In re Smigelski, supra,* 30 *N. J.,* at *p.* 527. If at a later date the appellants are in

a position to establish that they have actually been rehabilitated and that their release has been arbitrarily withheld, judicial relief will be available. See *In re Smigelski, supra,* 30 *N. J.,* at *p.* 528; *State v. Wingler,* 25 *N. J.* 161, 181 (1957). In the light of all of the foregoing, we find no basis for the appellants' claim of constitutional infirmity in *N. J. S.* 2*A* :4–37; indeed if their claim were to prevail they would be deprived of the benefits of the outer limitations of confinement prescribed in the enactment (see *In re Smigelski, supra,* 30 *N. J.,* at *p.* 525) while still being subject to the holding in *Johnson v. State, supra,* 18 *N. J.* 422, that there is judicial power to confine them until rehabilitated without regard to whether they have attained or passed the age of 21. The fact that the Legislature has vested in an administrative body the power of determining when they have been rehabilitated and are ready for release is in no sense unusual and presents no constitutional difficulties. See *In re Lewis, supra,* 11 *N. J.,* at *p.* 225; *cf. State v. Meyer,* 228 *Minn.* 286, 37 *N. W.* 2*d* 3 (*Sup. Ct.* 1949); *In re Herrera,* 23 *Cal.* 2*d* 206, 143 *P.* 2*d* 345 (*Sup. Ct.* 1943); *Cunningham v. United States,* 256 *F.* 2d 467, 472 (5 *Cir.* 1958).

The appellants contend that in the absence of a specific finding of an intent to kill they "can be guilty of nothing beyond a participation in the robbery and not of a homicide." The appellants were not charged with crime but were charged with juvenile delinquency as defined in *N. J. S.* 2*A* :4–14. They do not and cannot question that they were properly adjudged to be juvenile delinquents but they consider themselves aggrieved by the finding that their conduct resulted in a homicide. The occasion for the finding on that issue resulted from the provision in *N. J. S.* 2*A* :4–37 which bears on adjudications of juvenile delinquency predicated on conduct which would constitute homicide as defined in *N. J. S.* 2*A* :113–1, 2, 4, 5, "if committed by a person of the age of 18 years or over." If the appellants had not been under age when they participated in the

assault and robbery which resulted in Taurosa's death they could, under New Jersey's statutory provisions, have been found guilty of felony-murder without any finding of an intent to kill. See *State v. Calabrese,* 107 *N. J. L.* 115, 119 (*E. & A.* 1930); *State v. Carlino,* 98 *N. J. L.* 48, 53 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.* 1923); *cf.* 26 *Am. Jur., Homicide* §§ 39, 189 (1940). That being so there was no need here for any finding of an intent to kill and the determination that the appellants assaulted and robbed Taurosa and that as a result he died was sufficient to satisfy the purposes and requirements of *N. J. S.* 2A:4–37.

The appellants contend that Taurosa's death resulted from an "intervening cause" rather than the injuries inflicted by them. Apparently the intervening cause to which they refer is Taurosa's failure to seek medical care or take other steps which might have prevented his death. If, as the evidence indicates and the Juvenile Court found, the injuries inflicted by the appellants actually resulted in Taurosa's death, then his neglect in not taking care of himself would not constitute an intervening cause breaking the chain of causation in the legal sense nor would it impair the validity of the court's finding. See 1 *Wharton's Criminal Law and Procedure* § 201 (*Anderson's ed.* 1957); 2 *Burdick, Law of Crime* § 421 (1946); *cf. State v. Kellow,* 136 *N. J. L.* 1, 4 (*Sup. Ct.* 1947), affirmed 136 *N. J. L.* 633 (*E. & A.* 1948); *State v. Johnson,* 6 *W. W. Harr.* 341, 36 *Del.* 341, 175 *A.* 669 (*O. & T.* 1934). The appellants urge that the finding was against the weight of evidence but we are satisfied that it was adequately supported by the testimony in the record. The appellants signed detailed statements which described the attacks on Taurosa, the rifling of his pockets, and the nature and extent of their participation. Mrs. Naddeo and Mr. Stabile confirmed that the assault and robbery had occurred during the evening of June 26, 1959 and Dr. Albano, who had performed the autopsy, directly and firmly related the injuries which Taurosa had then received to his death on the following day. The attendant

circumstances persuasively supported Dr. Albano's conclusions. Dr. Goldberg's suggestion that Taurosa died from a cardiac condition and not as the result of his injuries lacked support and was fully refuted by Dr. Albano's testimony; the Juvenile Court acted well within its authority in rejecting it. *Cf. Heath v. State,* 77 *Ga. App.* 127, 47 *S. E. 2d* 906 (*Ct. App.* 1948). See *State v. Zelinski,* 33 *N. J.* 561 (1960); *State v. Dantonio,* 18 *N. J.* 570, 575 (1955).

▆▆ The final issue is whether assigned counsel should be allowed compensation for the legal services which they rendered. *R. R.* 6:9–1 provides that where a juvenile is charged with causing the death of a person and is unable to secure counsel, the court shall assign counsel to represent him and the provisions of *R. R.* 1:12–9, insofar as applicable, shall govern. *R. R.* 1:12–9 does not contain any provision for compensation to assigned counsel except in murder cases. Similarly, the Legislature has not made any provision for the source of compensation to assigned counsel, other than in murder cases; with respect to those cases it has directed that the sum allowed by the court "shall be paid by the county treasurer of the county where the indictment was found." See *N. J. S.* 2A:163–1. The history and terms of the statute and the court rule, as well as the settled practice, leave little room for doubt that assigned counsel are at present expected to serve without judicial allowance of compensation except where they represent indigents indicted for murder. The fairness of this restricted approach has been strongly questioned and suggestions have been made for broad revision of the present practice or complete replacement of the present system of assigning counsel by another system, perhaps that of the public defender. See *Note,* "Legal Aid to Indigent Criminal Defendants in Philadelphia and New Jersey," 107 *U. Pa. L. Rev.* 812, 834, 835 (1959); *cf. Beaney, The Right to Counsel in American Courts,* 135 (1955); Trebach, "The Indigent Defendant," 11 *Rutgers L. Rev.* 625, 634 (1957); *Note,* "The Right to Counsel in Misdemeanor Cases," 48 *Calif. L. Rev.* 501, 514 (1960).

The suggestions warrant serious study and consideration, preferably through the facilities of the Judicial Conference (*R. R.* 1:23), and they may well lead to rule modification and legislative action; in the meantime, however, no sound basis exists for awarding compensation to assigned counsel in proceedings before the Juvenile Courts. Such proceedings are not criminal but are exercises of the State's *parens patriae* jurisdiction in the interests of the juveniles. See *N. J. S.* 2A:4–34; *Johnson v. State, supra,* 18 *N. J.,* at *p.* 431; *Ex parte Newkosky, supra,* 94 *N. J. L.,* at *p.* 316; *cf. Pee v. United States,* 274 *F. 2d* 556, 559 (*D. C. Cir.* 1959). In the instant matter, the appellants were charged with juvenile delinquency and were committed as juvenile delinquents. They were never charged with the crime of murder nor were they ever in jeopardy of being sentenced for murder and their counsel never had the responsibility of defending against any charge or sentence for murder. See *N. J. S.* 2A:113–4. There was no murder case within the terms or contemplation of the court rule and statute and, consequently, the claim for the allowance of compensation must be rejected.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.