43 A.3d 454

STATE OF NEW JERSEY IN THE INTEREST OF A.C.

Superior Court of New Jersey,
Chancery Division, Family Part,
Monmouth County.

Decided April 27, 2012.

82

*Peter E. Warshaw, Jr.,* Monmouth County Prosecutor, attorney for plaintiff (*Jordan Williams,* Assistant Prosecutor).

*Michael Chazen,* attorney for defendant.

IADANZA, J.S.C.

A.C. was arrested on December 19, 2010, as a result of the three count complaint filed that day alleging he had committed a second degree sexual assault on October 30, 2010, against the victim D.F., and two acts of first degree aggravated sexual assault against the same victim on December 13, 2010.

A.C. was placed in the Middlesex County detention center on December 19, 2010. A retention hearing was held by video conferencing from the Middlesex County detention center on December 20, 2010. The State consented to a referral to the home detention electronic bracelet program. The matter was scheduled for a probable cause hearing on December 22, 2010.

On December 22, 2010, defendant's counsel appeared, waived probable cause and entered a not guilty plea on his client's behalf. An initial case management conference was scheduled for February 8, 2011. The juvenile was released on the home detention program with additional restrictions. The Division of Youth and Family Services ("DYFS") closed its case, satisfied that an adequate safety plan was in place in the home. Additional discovery was provided to defense counsel. Defense counsel's request to modify the release condition allowing removal from the home detention program to a house arrest B program was granted. The State indicated it would not be seeking waiver in this case or incarceration if the juvenile was adjudicated delinquent on the charges. A plea conference was then scheduled for March 8, 2011.

On March 8, 2011, defense counsel advised the court that he would be seeking a jury trial on behalf of his client. He advised the prosecutor and the court he would be relying on recent decisions from the Kansas Supreme Court and the New Hampshire Supreme Court.

The court entered a scheduling order on March 8, 2011, requiring defendant's motion and supporting brief to be filed within forty-five days, on notice to the prosecutor and State Attorney General. Responses were to be filed within thirty days of receipt of the moving papers, and reply ten days thereafter. Argument on the motion was scheduled for June 9, 2011.

The court received defendant's notice of motion and supporting brief on April 25, 2011; the State's brief on May 26, 2011; and defendant's reply on May 27, 2011. The State Attorney General's Office has not responded to the defendant's motion.

The court heard oral argument on June 9, 2011, and denied the motion for the reasons placed on the record on that date. This opinion amplifies the court's reasoning for its decision.

The court incorporates the chronological history of this case noted above.

Defendant challenged the constitutionality of *N.J.S.A.* 2A:4A–40, insofar as it denies a juvenile the right to a jury trial, asserting violations of the New Jersey Constitution, Article 1, §§ 9 and 10, and the United States Constitution under the Sixth and Fourteenth Amendments. He argues that since an adjudication in juvenile court may result in serious punishment, a right to jury trial is a fundamental right that is violated by the restrictions established in *N.J.S.A.* 2A:4A–40. He supports his position by relying on the statutes and court decisions of various other states that either provide a right to jury trial in their juvenile codes or have granted such a right in their court decisions. Counsel, acknowledging that those statutes and opinions represent a minority view in the country, nevertheless requests this court to adopt the practices and policies of these sister states, relying heavily on the decision and rationale expressed by the Kansas Supreme Court in *In re L.M.*, 286 *Kan.* 460, 186 *P.*3d 164 (2008).[1]

---

[1] Counsel conceded at oral argument that the New Hampshire Supreme Court decision in *In re Jeffrey C*, 146 *N.H.* 722, 781 *A.*2d 4 (2001) was not applicable due to the differences in juvenile disposition options in that state allowing the

Defendant's arguments can be summarized as follows:

1. Since juvenile proceedings have become more like adult proceedings, fundamental fairness requires that the right to a jury trial be afforded juveniles charged with serious offenses.

2. Since the juvenile system has abandoned or severely eroded the rehabilitative purposes of the system and focused on public safety, deterrence and punishment as its main purpose, the United States Supreme Court's plurality decision in *McKeiver v. Pennsylvania,* 403 *U.S.* 528, 91 *S.Ct.* 1976, 29 *L.Ed.*2d 647 (1971) is no longer persuasive and should not be relied upon by this court.

3. The possibility of up to four years incarceration and the mandatory application of Megan's Law registration if the juvenile is adjudicated delinquent in this case are so punitive as to mandate a right to a jury trial.

4. The registration and notification requirements of Megan's Law are violative of the concept of confidentiality of juvenile proceedings, impose serious consequences for life on the juvenile and, therefore, justify the right to a jury trial.

The State counters defendant's arguments by arguing:

1. That the defendant does in fact have a right to a jury trial if he wants one. He can request the court to voluntarily waive his case over to the criminal division pursuant to *N.J.S.A.* 2A:4A–27.

2. The juvenile's contention that he faces adult-like consequences and punishment if he is adjudicated delinquent are without merit; and

3. The New Jersey Constitution and federal Constitution do not require a trial by jury.

The history of the treatment of juvenile delinquency in New Jersey is set out in *State v. Monahan,* 15 *N.J.* 34, 35–41, 104 *A.*2d

---

juvenile judge in certain cases to incarcerate the defendant in a juvenile or adult facility.

21 (1954). As noted, in *State v. Tuddles*, 38 *N.J.* 565, 571–72, 186 *A.*2d 284 (1963):

[I]t was made clear that insofar as conduct is treated as delinquent rather than criminal, the legislative approach is protective and rehabilitative and not punitive. The philosophy of the juvenile court law is aimed at rehabilitation through reformation and education in order to restore a delinquent youth to a position of responsible citizenship. *In re Lewis*, 11 *N.J.* 217, 224 [94 *A.*2d 328] (1953); *see N.J.S.* 2A:4-2; *see,* also, Paulsen, "Fairness to the Juvenile Offender," 41 Minn. L.Rev. 547 (1957). The statutory scheme is designed to permit the exercise of the powers of the State as *parens patriae*, for the purpose of rehabilitating youthful offenders, and not of punishing them for the commission of a crime. *State v. Monahan, supra,* 15 *N.J.,* at p. 38 [104 *A.*2d 21]. In furtherance of the strong public policy that juvenile offenders should be accorded separate consideration and treatment, both for their own benefit and for the welfare of society, the Legislature has provided, in *N.J.S.* 2A:4-14, that the Juvenile and Domestic Relations Court shall have exclusive jurisdiction of all cases of juvenile delinquency.

This was a far cry from the process that a child under sixteen years of age was subjected to under the early legislation establishing our juvenile court. *L.* 1912, *c.* 353, §§ 607–08 provided that children under sixteen alleged to have committed a crime could be indicted and demand a trial by jury. In 1929 the Juvenile and Domestic Relations Court was established. *See L.* 1929, *c.* 157, §§ 276–84 (codified as *N.J.Rev.Stat.* 9:18–1 to 9:18–37). *See also, L.* 1929, *c.* 53, §§ 90–91. These statutes gave jurisdiction to that court to hear all cases against a child under sixteen who committed various offenses. Hearings were conducted without counsel and the child could be committed to an institution or placed on probation. Any application upon the status of a child before that court could not operate to impose any of the civil disabilities imposed by conviction, nor was the child to be deemed a criminal nor the adjudication a conviction. No mention is made of waiver of charges to adult court. Paragraph thirty of the law required all cases of children under the jurisdiction of that court to be determined without a jury.

The statute was amended in *L.* 1935, *c.* 284, §§ 914–15 to define "juvenile delinquency" to be the commission by a child under sixteen which if committed by a person of the age of sixteen or over would constitute, among other things, a felony, high misdemeanor or other offense, and in *L.* 1935, *c.* 285, § 916 to make it

clear that a person under the age of sixteen was deemed incapable of committing a crime under the common law or statutory law of the State.

In 1943, *L.* 1943, *c.* 97, §§ 319–21 (*N.J.Rev.Stat.* 9:18–12) expanded the jurisdiction of the Juvenile and Domestic Relations Court by allowing the court to hear cases of persons between sixteen and eighteen years of age if the matter was referred to it by the grand jury with the approval of the prosecutor.

In 1946, *L.* 1946, *c.* 77, §§ 267–68 (*N.J.Rev.Stat.* 9:18–12), the designation of juvenile delinquency was amended to cover the commission of the enumerated offenses by a child under eighteen years of age. A provision for waiver was included and a provision for the right to demand a jury trial upon waiver. This was expanded in *L.* 1948, *c.* 284, §§ 1191–93 (*N.J.Rev.Stat.* 9:18–12).

Two years after the U.S. Supreme Court decision in *McKeiver,* a major overhaul of the juvenile statutes took place with the adoption of *L.* 1973, *c.* 306, (codified in *N.J.S.A.* 2A:4–1 to –67). The statute implemented new provisions covering all proceedings concerning juveniles in the Juvenile and Domestic Relations Court, which were later transferred to the Superior Court as part of the unification of the court systems. It established as its stated purposes:

a. To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of juveniles coming within the provisions of this act;

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefore an adequate program of supervision, care and rehabilitation;

c. To separate juveniles from the family environment only when necessary for their health, safety or welfare or in the interests of public safety.

The legislative statement attached to the law noted that it presented "a unified orderly approach directed to rehabilitating juveniles so they become productive members of society while at the same time ensuring the safety of the public."

Sections eighteen and nineteen of the law set out the rights of juveniles in their proceedings to be:

18. Right to counsel. A juvenile shall have the right to be represented by counsel at every critical stage in the proceedings as provided by the Rules of Court.

19. No jury trial for juveniles. All defenses available to an adult charged with a crime, offense or violation shall be available to a juvenile charged with committing an act of delinquency.

All cases arising under this act not referred as provided by sections 7 or 8 shall be heard and decided by the juvenile and domestic relations court without a jury. The right to be secure from unreasonable searches and seizures, the right not to be placed twice in jeopardy for the same offense, and the right of due process of law shall be applicable in cases arising under this act as in cases of persons charged with crime.

In 1982 the New Jersey Code of Juvenile Justice was adopted. *L.* 1982, *c.* 77 (*N.J.S.A.* 2A:4A–20 to –91). The Senate Judiciary Committee statement stated:

This bill recognizes that the public welfare and the best interests of juveniles can be served most effectively through an approach which provides for harsher penalties for juveniles who commit serious acts or who are repetitive offenders, while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses. Moreover, the provisions of this bill and the accompanying bills reflect a philosophy which is pragmatic and realistic in nature rather than bound to any particular ideology.

[*Senate Judiciary Committee Statement* to A. 641 (1982)].

As part of the new code *N.J.S.A.* 2A:4A–40 provided:

All defenses available to an adult charged with a crime, offense or violation shall be available to a juvenile charged with committing an act of delinquency.

All rights guaranteed to criminal defendants by the Constitution of the United States and the Constitution of this State, except the right to indictment, the right to trial by jury and the right to bail shall be applicable to cases arising under this act.

The new code also expanded the standard purposes of its provisions to include:

a. To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of juveniles coming within the provisions of this act;

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefore an adequate program of supervision, care and rehabilitation;

c. To separate juveniles from the family environment only when necessary for their health, safety or welfare or in the interests of public safety;

d. To secure for each child coming under the jurisdiction of the court such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the State; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents;

e. To insure that children under the jurisdiction of the court are wards of the State, subject to the discipline and entitled to the protection of the State, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them.

[*N.J.S.A.* 2A:4A–21].

Those purposes were amended in *L.* 2001, *c.* 408, § 1, by adding to *N.J.S.A.* 2A:4A–21 (b), "and a range of sanctions designed to promote accountability and protect the public," and a new subparagraph (f) which stated:

Consistent with the protection of the public interest, to insure that any services and sanctions for juveniles provide balanced attention to the protection of the community, the imposition of accountability for offenses committed, fostering interaction and dialogue between the offender, victim and community and the development of competencies to enable children to become responsible and productive members of the community.

As the Legislature modified and supplemented the rights and procedures in the area of juvenile justice over the course of the last fifty years, so too have our courts. In a precursor to the *McKeiver* decision, in *In re J.W.*, 57 *N.J.* 144, 146, 270 *A.2d* 273 (1970), our Supreme Court denied the request of a twelve year old child charged with attempted robbery, assault and battery, breaking and entering with intent to commit larceny, larceny, receiving stolen property and various status offenses, to expand the rights established under *In re Gault*, 387 *U.S.* 1, 87 *S.Ct.* 1428, 18 *L.Ed.*2d 527 (1967), by granting the right of a jury trial to every juvenile accused of being delinquent by reason of conduct which in the case of an adult would entitle the accused that right, finding that introducing such a mode of trial "would disserve the interests of the juvenile."

In *In re the Matter of Registrant J.G.*, 169 *N.J.* 304, 777 *A.2d* 891 (2001), a juvenile who had admitted in 1996, when he was ten years old, to conduct that, if committed by an adult, could consti-

tute the crime of second degree sexual assault, challenged the application to him of Megan's Law and the classification process in determining his tier assignment. Although the request for jury trial apparently related to the hearing on his tier classification, the Supreme Court rejected any constitutional due process violations citing *N.J.S.A.* 2A:4A–40, and quoting from *McKeiver* that "concerning the right to jury trial, the United States Supreme Court has determined that trial by jury in the juvenile courts adjudicative stage is not a constitutional requirement." *Id.* at 338, 777 *A.*2d 891.

And in July 2009, well over a year after the Kansas Supreme Court's decision in *In re L.M.*, our Supreme Court, in its decision in *State ex rel. P.M.P.*, 200 *N.J.* 166, 975 *A.*2d 441 (2009), reversed the Appellate Division's denial of the right to counsel in certain circumstances where a juvenile complaint is filed by the prosecutor and immediate incarceration is sought, but again recognized and reaffirmed the exception in *N.J.S.A.* 2A:4A–40 prohibiting jury trials for juveniles.

■ Some comment must also be made concerning our court's view of the nature of juvenile proceedings. The Juvenile Code makes clear that juvenile court proceedings are not criminal prosecutions. They are the exercise of the State's *parens patriae* jurisdiction. *State in the Interest of T.L.O.*, 94 *N.J.* 331, 342 n. 5, 463 *A.*2d 934, (1983), *rev. on other grounds*, 469 *U.S.* 325, 105 *S.Ct.* 733, 83 *L.Ed.*2d 720 (1985); *In re State in the Interest of Steenback*, 34 *N.J.* 89, 104, 167 *A.*2d 397 (1961). The fact that some form of punishment is possible has never been considered by our courts as the sole factor in determining what rights a juvenile had in the adjudicatory or dispositional phase of their case.

The fact that a dichotomy exists between the rehabilitative and punitive purposes of our juvenile process is nothing new. In *In re Buehrer*, 50 *N.J.* 501, 509, 236 *A.*2d 592 (1967), Chief Justice Weintraub stated: "The argument assumes that punishment and rehabilitation are somehow incompatible. Of course, they are not ... Punishment and rehabilitation are not antagonists."

It is acknowledged that the adoption of the 1982 Juvenile Code and its subsequent amendments, in part, was a reaction to the need to protect public safety and resulted in the potential for harsher penalties for juveniles who committed serious acts or were repetitive offenders. *State v. Presha*, 163 *N.J.* 304, 314, 748 *A.*2d 1108 (2000); *State In re J.L.A.*, 136 *N.J.* 370, 377–79, 643 *A.*2d 538 (1994). Obviously the juvenile process today is very different from what existed both pre and post *In re Gault* as a result of many fundamental procedural due process rights afforded to juveniles. However,

> while we agree the juvenile delinquency process mirrors its adult counterpart in many ways, it is not the same. The admittedly different objectives of and procedures followed by the Family Part in juvenile delinquency matters cannot lead to the wholesale importation of the system of adversary criminal justice to the Family Part juvenile matters.

*State ex rel. P.M.P.*, 404 *N.J.Super.* 69, 80, 960 *A.*2d 758 (App.Div. 2008) *rev. on other grounds*, 200 *N.J.* 166, 975 *A.*2d 441 (2009). The different objectives—rehabilitative in nature—still remain the primary goal of our Juvenile Code.

It is in this context of our legislative and judicial decisional history that this court must consider defendant's request for a jury trial.

I address first defendant's argument that he is entitled to a jury trial under the Sixth Amendment to the United States Constitution as made applicable to the states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.*2d 491 (1968). Defendant relies on the analysis and decision of the Kansas Supreme Court in *In the Matter of L.M.*, *supra*, 286 *Kan.* 460, 186 *P.*3d 164. In that case the Kansas Supreme Court determined that the changes in the juvenile justice system in their state had become so patterned after the adult system and more akin to an adult criminal prosecution that the United States Supreme Court decision in *McKeiver* was no longer a binding precedent to follow and, therefore, held that a constitutional right to jury trials in juvenile cases was required under the

Sixth and Fourteenth Amendment of the United States Constitution and their state constitution. *Id.* at 169–170.

In *A.C. IV v. Colorado*, 16 *P*.3d 240, (Colo.2001), the Colorado Supreme Court succinctly summarized the reasoning of *McKeiver*:

In *McKeiver v. Pennsylvania*, the United States Supreme Court addressed whether the Due Process Clause mandates that the right to a jury trial applies to juvenile delinquency adjudications. 403 *U.S.* at 530 [91 *S.Ct.* 1976] (1971). The Court concluded that 'trial by jury in the juvenile court's adjudicative state is not a constitutional requirement.' *Id.* at 545 [91 *S.Ct.* 1976]. The Court reasoned that mandating jury trials in juvenile proceedings as a constitutional matter 'will remake the juvenile proceeding into a full adversary process and will put an effective end to what has been the idealistic prospect of an intimate, informal, protective proceeding.' *Id.* Further, the Court held that the 'imposition of the jury trial on the juvenile court system would not strengthen greatly, if at all, the fact finding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner.' *Id.* at 547 [91 *S.Ct.* 1976]. The Court found that injecting a jury trial into juvenile proceedings as a matter of right would bring to the juvenile system 'the traditional delay, the formality, and the clamor of the adversary system and possibly, the public trial' and would ultimately equate juvenile adjudications with criminal trials. *Id.* at 550 [91 *S.Ct.* 1976]. The Court, while recognizing the problems and disappointments stemming from the juvenile system, found that mandating a jury trial in juvenile adjudications would not aid states in rehabilitating juvenile offenders. In fact, the Court feared such a mandate might impede states from further experimentation seeking creative solutions to the problems of young offenders. *Id.* at 547 [91 *S.Ct.* 1976]. The Court concluded by noting that a state may, at its own discretion, mandate jury trials in juvenile proceedings as it sees fit to further the goals of the juvenile system. *Id.*

Most jurisdictions that have dealt with the issue of the continued viability of *McKeiver* have determined that it is still settled law; that is, jury trials in juvenile proceedings may be provided if a State chooses to do so, but it is not a mandated right required by concerns of fundamental fairness under the Federal Constitution. *See, State in the Interest of A.J.*, 27 *So*.3d 247 (La.2009); *But see, In re Jeffrey C., supra,* 146 *N.H.* 722, 781 *A*.2d 4.

Our own Supreme Court, although not reviewing and analyzing the issue directly, appears to be in agreement with the majority position on the issue. *See In re J.G., supra,* 169 *N.J.* 304, 777 *A*.2d 891; *State ex rel. P.M.P., supra,* 200 *N.J.* 166, 975 *A*.2d 441. And our Legislature, as *McKeiver* allows, has chosen not to mandate jury trials in juvenile matters.

■ Our Juvenile Code mirrors in many respects the systems in place in Louisiana and Washington when similar federal constitutional claims were made and a federal constitutional right to a jury trial in juvenile proceedings was rejected. *State In re A.J., supra,* 27 *So.*3d 247; *State of Washington v. Schaaf, et al.,* 109 *Wash.*2d 1, 743 *P.*2d 240 (1987). This court likewise finds no basis for a claim of a right to a jury trial in juvenile proceedings under the federal Constitution in the Sixth or Fourteenth Amendments.

■ Defendant claims in the alternative a right to a jury trial under our State Constitution, Article 1, Paragraphs 9 and 10, arguing that *N.J.S.A.* 2A:4A–40's prohibition of same is unconstitutional. Defendant bears the burden of demonstrating clearly the unconstitutionality of this statute. *City of Jersey City v. Farmer,* 329 *N.J.Super.* 27, 38, 746 *A.*2d 1018 (App.Div.2000), *certif. denied,* 165 *N.J.* 135, 754 *A.*2d 1211 (2000). There is a strong presumption of its constitutionality. *WHYY, Inc. v. Glassboro,* 50 *N.J.* 6, 13, 231 *A.*2d 608 (1967), *rev. on other grounds,* 393 *U.S.* 117, 89 *S.Ct.* 286, 21 *L.Ed.*2d 242 (1968). "To declare a statute unconstitutional is a judicial power to be delicately exercised." *Id.* This power should be exercised rarely by a trial court, and only then when the statute is plainly at odds with the Constitution. *Guy v. Petty,* 275 *N.J.Super.* 536, 542, 646 *A.*2d 546 (Law Div.1993).

Defendant relies on some of the same arguments for the establishment of a state constitutional right to a jury trial as he did seeking the establishment of a federal constitutional right.

■ This court disagrees with defendant that the extension of certain similar procedural due process rights afforded adults to juveniles requires all rights, including trial by jury, to juvenile proceedings. The concepts of due process and fair treatment engrained in the fabric of our state constitution are amply protected in bench trials conducted by juvenile court judges. To expand even further the formalities of the criminal adjudicative process by requesting jury trials in juvenile matters would effectively result

in there no longer being a need for a separate process for them at all.

Defendant's argument that the severe nature of the potential discretionary and mandatory dispositional options if the juvenile is adjudicated delinquent requires a jury trial is also misplaced.

The court incorporates its previous discussions regarding the continued applicability of the well established core philosophy of the state's Juvenile Code set out earlier in this opinion.

There has always existed the possibility of incarceration as a dispositional option under the laws applied to juveniles in this State pre or post *In re Gault, supra,* 387 *U.S.* 1, 87 *S.Ct.* 1428, 18 *L.Ed.*2d 527 and *McKeiver, supra,* 403 *U.S.* 528, 91 *S.Ct.* 1976, 29 *L.Ed.*2d 647. That dispositional option, with placement in a setting where a juvenile's liberty and freedoms are restricted while at the same time his or her rehabilitation is sought through the provision of social services, education and vocational training, fosters the very underpinnings of the view adopted and continued by our Legislature and our courts for a separate juvenile justice system: a system that is not looked upon as a criminal prosecution; a system where, unless waiver is sought over to the Criminal Division for trial as an adult, a juvenile is not subject to presumptions of incarceration, minimum mandatory sentences (except for the few minor exceptions set out in *N.J.S.A.* 2A:4A–43e (1) and (2) for up to sixty days for certain charges, three strikes legislation, the No Early Release Act, *N.J.S.A.* 2C:43–7.2, and except under very limited circumstances, consecutive sentences; a system where the juvenile has the protection of the confidentiality of proceedings and the right to object to a public trial if one is sought by interested parties, and a panoply of dispositional options unavailable in adult criminal sentencings.

The fact that a minority of our sister states have chosen to deal differently with the issue under their state constitutions does not require this State to follow in their footsteps. Each State is "allowed to experiment further and to seek new and different

ways the elusive answers to the problems of the young," *McKeiver, supra,* 403 *U.S.* at 547, 91 *S.Ct.* at 1987, 29 *L.Ed.*2d at 662.

In fact, that is exactly what New Jersey has done. Since 2004, it has been participating in the National Juvenile Detention Alternative Initiative initiated by the Annie E. Casey Foundation. Through the collaboration and cooperation of our Supreme Court, the Legislature, the Administrative Office of the Courts and the Juvenile Justice Commission, case processing has been streamlined and pre-adjudication detention and dispositional incarceration have been drastically reduced.

Until a higher court or the Legislature deems juvenile proceedings to be criminal proceedings, our "experiment" of bench trials for juveniles in the Family Part should continue.

Defendant's further argument that the possibility of registration under Megan's Law would result in such a serious consequence akin to severe punishment is also without merit as our Supreme Court has already determined that such a requirement is not punitive *Doe v. Poritz,* 142 *N.J.* 1, 662 *A.*2d 367 (1995) or considered dispositional in nature. *In re J.G., supra,* 169 *N.J.* at 334–36, 777 *A.*2d 891.

One final note: in reaching its decisions in this matter, the court rejected the State's argument that the juvenile already is guaranteed a jury trial if he wants one by merely electing to voluntarily seek transfer of his case to the Criminal Division for trial as an adult. That position ignores the catastrophic impacts of sentencing under Title 2C that would occur upon conviction versus the dispositions that would be considered under the Juvenile Code. It realistically results in no choice at all.

For the reasons noted above, defendant's motion for a jury trial is denied.