STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES CULVER, DEFENDANT-APPELLANT.

Argued February 4, 1957—Decided March 4, 1957.

*Mr. Gene King* argued the cause for the appellant.

*Mr. Robert O. Brokaw,* Assistant Prosecutor for Somerset County argued the cause for the respondent (*Mr. Leon Gerofsky,* County Prosecutor for Somerset County).

The opinion of the court was delivered by

VANDERBILT, C. J.   This is an appeal by the defendant from the unanimous affirmance by the Appellate Division of the judgment of the Somerset County Court correcting life sentences illegally imposed upon the defendant in 1947.

Briefly, the facts are these:   On December 23, 1947 the defendant was brought before the Somerset County Court of Special Sessions to answer to three separate allegations, each charging in one count a separate armed robbery and in a second count a previous conviction for three high misdemeanors.   He pleaded guilty to all of the charges.   The court, then believing that *R. S.* 2:103–10 (now *N. J. S.* 2A:85–12) relating to fourth offenders was applicable and that a life sentence in the circumstances was mandatory, imposed such a sentence on each of these allegations, the terms of which were to run concurrently.

In 1953 the defendant, by application for a writ of *habeas corpus,* sought to question the propriety of the sentence so

imposed upon him. That application, being conceived as improper under *In re Kershner,* 9 *N. J.* 471 (1952), was treated by the County Court to whom the matter had been referred by the assignment judge as one for the correction of sentence. The sentences were held to be legal and the proceedings were dismissed. On appeal, the Appellate Division of the Superior Court reversed that judgment holding that:

> "Two of the three convictions charged against the defendant, having been disposed of on the one occasion (January 26, 1940), (regardless of whether the record discloses an order for consolidation), were, in fact, consolidated for trial on the same occasion and may, therefore, be considered as only one conviction.
>
> In view of the foregoing conclusions it clearly appears that at the time of the imposition of the life imprisonment sentence in the instant case there was proof of only two separate occasions upon which Culver had previously been convicted of high misdemeanors. The life imprisonment sentence was therefore, erroneously imposed." See 30 *N. J. Super.* 567–568.

In the majority opinion the Appellate Division indicated that:

> "The defendant may apply at any time to the sentencing court for a correction of the invalid sentence so imposed upon him." *Id.,* 30 *N. J. Super.,* at *page* 568.

One of the judges taking a different view as to the meaning of "three separate occasions" as used in the statute, *R. S.* 2:103–10, dissented. On appeal to the Supreme Court we affirmed on the opinion below, see 16 *N. J.* 483 (1954).

Instead of applying for a correction of sentence, the defendant sought to be discharged from custody, asserting that the trial court was without power to resentence him, a theory which he still adheres to on the present appeal. His bid for freedom was denied, and following the denial the prosecutor of Somerset County moved under *R. R.* 3:7–13 to correct the illegal sentences. The defendant objected to such procedure, urging again that the court lacked the authority to take any such action. The original sentences, however, were set aside and the defendant was then resentenced. On one allegation he received a term of 10 to 15 years for robbery, with an additional consecutive term of 3 to 5 years for being

armed. On another of the allegations he received a similar sentence which was to run concurrently with the first sentence imposed. On the last of the allegations another consecutive sentence of 10 to 15 years was imposed for the robbery but no additional sentence was imposed for being armed. The aggregate prison sentence given him was, therefore, 23 to 35 years; credit was expressly allowed for the time already served by the defendant. No presentence investigation was made before the imposition of these new, corrected sentences.

The defendant then appealed to the Appellate Division where the resentence judgment was unanimously affirmed; see 40 *N. J. Super.* 427 (1956).

He appealed from that affirmance to this court without leave. The State moved to dismiss this appeal on the ground that the defendant had no appeal as of right to the Supreme Court, *R. R.* 1:2–1, and further that he had failed to file his brief on appeal within the 30 days provided for such act by *R. R.* 1:7–12(*a*). We denied the State's motion and accorded the defendant an opportunity to present his case.

The defendant raises two points. The first is that the resentence judgment was invalid because no presentence investigation was made prior to the imposition of that resentence pursuant to the requirements of *R. R.* 3:7–10(*b*). The nature of his argument is that at the time of the resentence, *R. R.* 3:7–10(*b*) had been amended so as to provide for such procedure in every case, taking from the sentencing court the discretionary power to waive the presentence investigation.

In disposing of this same argument below the Appellate Division noted that the presentence investigation requirement was not in effect in 1947 when the defendant was originally sentenced, and that our present Rule, *R. R.* 3:7–10(*b*), had passed from a discretionary requirement under former *Rule* 2:7–10(*d*) to a "mandate of the highest order." The court said:

"While it cannot be characterized as a jurisdictional prerequisite to a valid sentence, its importance to the proper administration of

criminal justice is so great that in proper cases the sentence may be vacated and a remand granted in order to secure compliance.

It must be kept in mind that the case will be rare indeed in which a prisoner can show prejudice stemming from disregard of the rule. Realization of this fact and of the important social purpose to be served by the presentence investigation, ought to stimulate an unswerving adherence to the practice, *Cf. State v. Benes, supra* [16 *N. J.* 389]. However, under the unusual circumstances of the present matter, we do not consider it necessary to direct a remand." (40 *N. J. Super.* 432.)

The unusual circumstances referred to were, of course, the fact that the defendant had spent more than seven years in prison under the observance of the authorities, during which time they had an excellent and ample opportunity to gain first-hand knowledge of the defendant's conduct and attitudes and to appraise his progress toward rehabilitation. This is indeed substantially more informative than the "definite minima of the facts and circumstances which bear on a just sentence" conceived to be necessary by the Committee on Improvement of Sentencing and Probation Procedures for intelligent and fair sentencing of criminal offenders; see the report of that committee in 75 *N. J. L. J.* 329, 333 (September 18, 1952).

We are in accord with the views expressed there, but even in the circumstances of this case an endeavor should have been made to approximate more closely the mandate of the rule presently in effect.

The other point raised by the defendant is that in spite of the provisions of *R. R.* 1:5-1(*c*), *R. R.* 3:7-10(*c*), *R. R.* 3:7-13 and 15 dealing with the correction of an illegal and improper sentence, the trial court was without power to resentence him after his original sentence had been partially executed. He asserts that at common law a court had no power to correct an illegal sentence and that prior to the statutes changing the common law and authorizing the correction of illegal sentences, the first of which was *L.* 1898, *c.* 237, *p.* 866, the court had to set free any defendant illegally sentenced, citing *State v. Gray,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875); *State v. Addy,* 43 *N. J. L.* 113 (*Sup. Ct.* 1881);

*Roop v. State,* 58 *N. J. L.* 487 (*Sup. Ct.* 1896). He says that up until 1952 we have had statutes providing for the correction of illegal and improper sentences, nullifying the common law rule and giving power to the courts to do so, *R. S.* 2:190–15, 2:192–1, 2:195–23 and 2:195*A*–13 and therefore, at the time of the promulgation of the Supreme Court rules there was statutory basis for such jurisdiction or power in the courts over which the rules of the Supreme Court could operate. He contends that with the revision of *Title* 2 and its repeal upon the adoption of *Title* 2*A,* these sections of the *Revised Statutes* passed out of existence, and since they were not re-enacted by the Legislature as part of the new *Title* 2*A,* the power or jurisdiction of the court to correct sentences was withdrawn and the law reverted to its common law form in the days of *State v. Gray, supra,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875). He further contends that the rule-making provisions of the *Constitution of* 1947, namely, *Art.* VI, *sec.* II, *par.* 3, conferred upon and delegated to the Supreme Court the power to regulate merely the manner in which the judicial power of this State was to be exercised; that that power includes only the authority to regulate the practice and procedure in the courts, but subject to substantive law, and that the creation of new judicial powers and the enlargement of the jurisdiction of the courts to correct illegal sentences beyond that which they had at common law, such as was done by *R. R.* 3:7–13 in particular, was a matter of substantive law and beyond the power of the Supreme Court.

The days when substantial justice must be sacrificed for the sake of blind adherence to strict technicalities long since outmoded have passed in this State and are, we hope, beyond recall.

This argument of the defendant focuses our attention on *Winberry v. Salisbury,* 5 *N. J.* 240 (1950), where we held that the phrase "subject to law" was to be construed to mean that the rule-making power of the Supreme Court granted by the new Constitution must not invade the field of substantive law. The Supreme Court has the power to make rules

governing procedural matters whether they extend or restrict procedures existing before the Constitution of 1947. We have on several occasions indicated that the purpose of the revision of *Title* 2 was to delete from the statute books all procedural matter therein, leaving the rules promulgated by the Supreme Court pursuant to its rule-making power as the sole expression on the subject; see *Bank of Commerce v. Markakos,* 22 *N. J.* 428 (1956) ; *State v. Haines,* 18 *N. J.* 550 (1955) and *State v. Otis Elevator Co.,* 12 *N. J.* 1 (1953). That matters of sentence or the correction of sentences relate to procedure admits of no doubt. In *In re Hardman,* 131 *N. J. L.* 257, 258 (*Sup. Ct.* 1944), the court said:

"The purpose of a trial of an indictment is to ascertain the truth of the charge and the protection of society from evil doers. The sentencing is an incident and seems procedural or directory rather than mandatory, and the trial court has wide discretionary power in performing that duty."

The striking of the provisions of old *Title* 2 relating to the correction of illegal or improper sentences was highly significant legislative recognition that such matters fall within the realm of procedure.

The contention urged by the defendant is similar to that urged by the defendant in *State v. Haines,* 18 *N. J.* 550 (1955), and disposed of by us in favor of the rule-making power. In the *Haines* case we dealt with *R. R.* 3 :3–10 (*b*), which enabled the assignment judge to continue the term of the grand jury, a power which it was claimed the court did not have at common law and which could only be conferred by a statute. The defendant contended that at common law the life of a grand jury ceased with the expiration of the term of court for which it had been summoned and that the term of the service of such grand jury could only be continued beyond that time if authorized by a statute, and that since *R. S.* 2 :88–26 through 28, authorizing such extension, were not re-enacted in *Title* 2A, the assignment judge was without authority to order the extension and that the Supreme Court was without power to confer the authority

by rule. We held there that the extension was a matter of procedure and not substance, and within the rule-making power granted by Constitution to the Supreme Court; and so is the matter here.

■ The *Constitution of 1947, Art. VI, Sec.* I, *par.* 1, moreover, vested the judicial power of government in the Supreme Court, the Superior Court, County Courts and inferior courts of limited jurisdiction. The Constitution also provides that:

"All law, statutory and otherwise, all rules and regulations of administrative bodies and all rules of courts in force at the time this Constitution or any Article thereof takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." *Art.* XI, *Sec.* I, *par.* 3.

This provision is understood to include common law, and the term "otherwise" not only to include change by the legislative process but also by the processes of change inherent in the common law. In *Heise v. Earle,* 134 *N. J. Eq.* 393, 402 (*E. & A.* 1943), the Court of Errors and Appeals reminds us that:

"The common law consists of judicial opinions and as such they are only 'evidence of what is common law'; the law and the opinions of the judges are not always convertible terms (*Jones' Blackstone* 122). Our constitution does not obligate the courts of this state to follow or adopt the reasoning and decisions of the English common law courts. It is the principles of the common law which we in common with most of the states have adopted generally, and not necessarily the decisions of the English courts in exposition of the common law."

At the time of the adoption of the 1947 Constitution the judicial power included whatever powers with respect to the correction of sentences there then existed by reason of statutes and the common law.

■ The defendant has conceded that up to January 1, 1952, the date on which *Title 2A* became effective, there was power in the court to resentence him, but not thereafter. One of the fallacies of his argument is that he has failed

504

to take cognizance of the fact that the Legislature, fearing that claims such as this might be put forth and that some hiatus might be created in existing rights or remedies, or even that an unintended change in the law might be effected by the repeal of the procedural provisions of *Title 2* and the adoption of *Title 2A,* expressly provided that:

"*Title 2* of the *Revised Statutes*, as amended and supplemented, is repealed, but such repeal shall not affect any right now vested in any person pursuant to the provisions of said title, nor any remedy where an action or proceeding thereunder has heretofore been instituted and is pending on the effective date of said repeal.

The said repeal of *Title 2* of the *Revised Statutes*, as amended and supplemented, shall not of itself be deemed to revive any common law, right or remedy abolished by any provision of the said title." *Laws of* 1951, *chapter* 344, *sections* 4 and 5.

The obvious intention of the Legislature was to continue the law in its existing state except in such instances where there was express provision made for a change or some positive inconsistency was created that was incompatible with the provisions of the prior law; see *L.* 1951, *c.* 344, *sec.* 6. In the circumstances of the case now before us we think it cannot be said that the right of the people of the State of New Jersey to punish this defendant for his criminal acts and to correct this punishment, if it was illegally or improperly imposed, was not preserved by the above quoted sections of the act repealing *Title 2*.

Furthermore, the power to punish criminal offenders granted to the County Court by *N. J. S. 2A* :3–4 would seem naturally to include the power to correct the sentences imposed by it; *cf. Russo v. Walsh,* 18 *N. J.* 205, 211 (1955); *Russo v. Governor of State of New Jersey,* 22 *N. J.* 156, 166, 167 (1956).

Moreover, no one can question that the release of the defendant, a properly convicted criminal offender by his own admission, is an undesirable result that the Legislature acted to prevent almost 60 years ago; and, whether the power to resentence or whether the defendant's right to freedom where

the original sentence is illegal is a substantive or procedural matter, by the measures taken in the revision of *Title 2* and the adoption of *Title 2A*, it is unquestionable that the Legislature clearly intended that resentencing was to be governed by rules of court.

Nor can it be said, apart from any statutory considerations, that our courts, according to present-day concepts and standards, are without power to correct an illegal or improper sentence. One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his *Interpretations of Legal History* (1922) when he stated, "Law must be stable, and yet it cannot stand still." And what has been done in the past is but one of the factors determinative of the present course of our law—a truism which has not gone unrecognized among the great thinkers of the legal profession. Thus, Mr. Justice Holmes recognized that:

"To rest upon a formula is a slumber that, prolonged, means death"; *Collected Legal Papers* 306 (1920).

Mr. Justice Cardozo has said:

"Few rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end. If they do not function they are diseased. If they are diseased, they must not propagate their kind. Sometimes they are cut out and extirpated altogether. Sometimes they are left with the shadow of continued life, but sterilized, truncated, impotent for harm"; *Nature of the Judicial Process* 98 (1921).

Professor Williston, in *Some Modern Tendencies in the Law* (1929), at *page 125* observed:

"Uniform decisions of 300 years on a particular question may, and sometimes have been overthrown in a day, and the single decision at the end of the series may establish a rule of law at variance with all that has gone before."

And Holdsworth, in describing the fairly wide limits within which judges under the Anglo-American case law system are enabled "to apply to old precedents a process of selection and rejection which brings the law into conformity with modern conditions," has said:

"This process of selection and rejection has been applied to the law laid down in the Year Books; and generally the rules there laid down, which are still part of our modern law, have survived because they suit modern needs." *Essays in Law and History* 161, 162 (1946).

But this is no new doctrine. The last words in Coke's *Fourth Institute,* his last and greatest work, expressed the same thought:

"And we will conclude with the aphorism of [Edmund Plowden] the great lawyer and sage of the law (which we have heard him often say) *Blessed be the amending hand.*"

The factors to be weighed in the balance in determining the present course of the law include the reasons for the rule, the present requirements of the environment in which the rule is to be applied, the dangers incident to any change and the evils resulting from its continuance. The power of growth is inherent in the common law. This has been strikingly illustrated in our change of views as to rights in the air brought about by the invention and use of the airplane:

"It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum.* But that doctrine has no place in the modern world." *United States v. Causby*, 328 *U. S.* 256, 260, 66 *S. Ct.* 1062, 1065, 90 L. Ed. 1206, 1210 (1946).

The classic examples of this process of change in the common law to meet new conditions are Judge Cardozo's great opinion in *MacPherson v. Buick Motor Co.*, 217 *N. Y.* 382, 111 *N. E.* 1050 (*Ct. App.* 1916), which created a much-needed direct right in a purchaser against the manufacturer for injuries caused by latent defects in an article purchased at retail, and *Funk v. United States*, 290 *U. S.* 371, at *page* 382, 54 *Sup. Ct.* 212, at *page* 215, 78 *L. Ed.* 369, at *page* 375 (1933), where the court overruled the ancient common-law rule that precluded a wife from testifying in behalf of her husband in a criminal proceeding against him, saying:

"That this court and the other federal courts, in this situation and by right of their own powers, may decline to enforce the ancient rule of the common law under conditions as they now exist we think is not fairly open to doubt."

In *State v. Gray, supra*, 37 *N. J. L.* 368 (*Sup. Ct.* 1875), the court set aside the defendant's sentence to a term in prison at hard labor as illegal because the specific offense for which he had been convicted was not punishable at hard labor. In discharging him from custody the court held that at common law it had no power to impose the proper sentence or to remand for that purpose, and in the absence of statute granting such power the only course open to it was to set the prisoner free. The court relied for its authority on an ancient rule dating back to the time of Lord Coke and on decisions in other states which in turn had relied on the English precedents. Lacking any positive legislative or judicial expression on the subject in this State, the court concluded that it was:

"Constrained to follow the almost unbroken current of decisions by judges of eminent ability, if the precise point, determined in those cases, was now under consideration." *Id.*, 37 *N. J. L.*, at *page* 371.

In *State v. Addy, supra*, 43 *N. J. L.* 113 (*Sup. Ct.* 1881), and in *Roop v. State*, 58 *N. J. L.* 487 (*Sup. Ct.* 1896), the courts complacently followed suit without considering whether the reason for the rule had disappeared in a new age.

508

In *Bindernagle v. State*, 61 *N. J. L.* 259 (1897), the Court of Errors and Appeals avoided the issue by holding an erroneous part of a sentence, the designation of the place of imprisonment, capable of being stricken from the record. On reargument, *Id.*, 61 *N. J. L.*, at *page* 261, the majority reaffirmed, but Chief Justice Magie, dissenting, for the first time in the case urged that on the precedent of *State v. Gray, supra*, a reversal was required. The same court in *State v. Huggins*, 84 *N. J. L.* 254, 260 (1912), made a reference to the rule by way of *dictum* and pointed to the fact that the *Bindernagle* case led the Legislature to enact the first of the remedial statutes. Then in *Caprio v. Mother Superior of Home of Good Shepherd of City of Newark*, 91 *N. J. L.* 14 (*Sup. Ct.* 1917), after construing one of the remedial statutes (*L.* 1914, *p.* 34) as not including the power to increase a prisoner's sentence after she had served all but six weeks of a valid two-year sentence, the court fell back upon the old English rule.

The majority of the courts in this country have seen fit to distinguish the English rule. The greater number of American cases have adopted the rule that neither during nor after the term in which it was rendered, could a valid and lawful sentence be corrected or modified by a trial court after execution of the sentence had begun; see *Caprio v. Mother Superior of Home of Good Shepherd of City of Newark, supra*, 91 *N. J. L.* 14 (*Sup. Ct.* 1917), and the cases collected and discussed in the annotation in point in 168 *A. L. R.* 706, at 707–711. In some cases, however, the courts have permitted alteration of a valid sentence provided it was done at the same term. Numbered among these in *State v. White*, 103 *N. J. L.* 153, 155 (*E. & A.* 1926), where the apparent indication is that although the sentence was changed from 4 to 7 years to 20 to 30 years on the same day, the initial sentence of the court had been entered upon; and in some cases resentence has been permitted after execution of the sentence has begun only provided the new sentence is in reduction of the old; see 168 *A. L. R., supra*, at *pages* 712–714.

An even greater number of courts, however, have adopted the view that even an invalid or illegal sentence, which is beyond the power of the trial court to impose, may be corrected after the execution of the sentence has begun and without regard to the term of court at which it is done; *Id.,* at *pages* 719–721. Among these authorities *State v. Gray, supra,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875), where the sentence was illegal, is counted in the minority. The theory upon which these cases are based is clearly set forth in *DeBenque v. United States,* 66 *App. D. C.* 36, 85 *F. 2d* 202, 206, 106 *A. L. R.* 839, 844 (*Ct. App. D. C.* 1936):

"The theory seems to be that where the original judgment is void, it, in form of law, accomplished nothing, there was no final disposition of the case, and the court's power was therefore unexercised; and, in point of substance, the defendant, having sought release on the theory that the judgment was void, cannot turn about and escape due punishment merely because the term has passed, that is to say, the defendant cannot assert the judgment void to defeat it, and then assert it merely voidable to defeat a new judgment."

Whatever may have been the reason giving rise to the original English rule, there seems to have been no sound reason for the court in *State v. Gray, supra,* to have adopted that same strict view, and an analysis of the cases would seem to indicate that on other occasions, the courts of New Jersey, while appearing to be in agreement with the rule in the *Gray* case, have silently adopted and followed the rule of the greater weight of authority; see *Bindernagle v. State, supra,* 61 *N. J. L.* 259 (*E. & A.* 1897), and *Caprio v. Mother Superior of Home of Good Shepherd of City of Newark, supra,* 91 *N. J. L.* 14 (*Sup. Ct.* 1914).

This is a situation where it is easy to see from our own cases the sound basis for the ancient English rule. In *Patterson v. State,* 48 *N. J. L.* 381, 383 (*Sup. Ct.* 1886), we are told that:

"In the early days of English criminal jurisprudence, when even a trifling larceny was punishable with death, there was reason why the judicial mind should exhaust its ingenuity in aid of the defence,

and seize upon every technicality to avert from the prisoner a punishment so disproportionate to his crime. In our time a more humane system of criminal law has been adopted, which graduates the punishment according to the magnitude of the offence, and in which there is nothing to shock our sense of justice. The reason for resorting to mere technicality to enable the criminal to evade the sanctions of the law no longer exists, and the practice to which that reason led should therefore cease. Men who make their lives a scourge to society must answer its violated laws, and can justly demand, in a judicial tribunal, nothing except a fair trial according to the laws of the land, in which no substantial right is denied them. * * * It is of the utmost importance to society that its criminal classes shall understand that the penalty surely follows the crime."

By the time of the decision in *State v. Gray,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875), however, our criminal jurisprudence had advanced to the stage reflected in the *Patterson* case and the reason for construing the law in favor of a dangerous criminal had long since disappeared.

Certainly, time itself has indicated that the tide has run against the view taken in *State v. Gray, supra.* As long ago as 1609, in *Milborn's* case, 7 *Coke* 7a (*K. B.* 1609), Lord Coke stated that the reason for the law is the soul of the law, and if the reason for a law has changed, the law is changed. More recently, Mr. Justice Holmes said:

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." *Collected Legal Papers* 187 (1920).

Blind imitation of the past is what we find as the basis for the holding in *State v. Gray, supra.*

The life sentences imposed upon the defendant Culver in 1947 were based upon an improper construction by the sentencing court of the fourth offender statute, *R. S.* 2:103–10 (now *N. J. S.* 2A:85–12), *supra,* and accordingly it was erroneous to impose the sentence in question where there were only two previous high misdemeanors, *R. S.* 2:166–1, *R. S.* 2:176–5 (now *N. J. S.* 2A:141–1, 2A:151–5, *N. J. S. A.*) ; see *United States v. Bozza,* 155 *F.* 2d 592, 595

(3 *Cir.* 1946), affirmed on this point 330 *U. S.* 160, 67 *S. Ct.* 645, 91 *L. Ed.* 818 (1946). Therefore, even in the absence of any statutory authorization to correct a sentence illegally imposed, we believe that the sentences originally imposed on this defendant were in fact improper and that the court's jurisdiction to impose a correct sentence had not expired until a valid sentence was imposed.

"To hold otherwise would allow the guilty to escape punishment through a legal accident." *Pollard v. United States*, 77 *S. Ct.* 481, 485.

The responsibility of the court does not end with the conviction and sentences of criminal offenders, *R. R.* 1:5–1(*c*). The sentencing court is therefore directed to obtain an investigation report called for by *R. R.* 3:7–10(*b*), and if it develops facts or circumstances which in the opinion of the sentencing court indicates that a different sentence should have been imposed, to resentence the defendant in the light of that report. The sentencing court should advise the defendant of its receipt of the report and its determination.

Except as so modified, the judgment is affirmed.

BURLING, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—None.