67 N.J. Super. 414 (1961)
170 A.2d 830
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES JOHNSON, THORNTON PUGSLEY, JOHN COWAN AND LEROY JOHNSON, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1961.
Decided May 5, 1961.
*416 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Malcolm H. Greenberg argued the cause for the defendants John Cowan and Leroy Johnson.
Mr. Leslie W. Finch argued the cause for the defendants James Johnson and Thornton Pugsley.
Mr. C. William Caruso, Special Legal Assistant Prosecutor, argued the cause for the plaintiff (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
The opinion of the court was delivered by GAULKIN, J.A.D.
Defendant James Johnson was convicted of rape, and sentenced to 20 to 30 years in prison. *417 Defendants Thornton Pugsley, John Cowan and Leroy Johnson were convicted of rape and kidnapping, and sentenced to consecutive sentences of 20 to 30 years for the rape, and 30 to 35 years for the kidnapping, or a total of 50 to 65 years. All four appeal.
The four defendants, together with seven others, were charged in one indictment with the rape of one C.J., and, in a separate indictment, with kidnapping her. Over the objections of the defendants, the two indictments were consolidated for trial. All 11 defendants were tried together. Five were acquitted by direction of the court at the end of the State's case. Two more were acquitted by the jury.
Defendants' first ground of appeal is that the trial of 11 men, each charged with kidnapping and rape, in one consolidated trial was in derogation of the right to a fair and impartial jury trial, guaranteed by the New Jersey and U.S. Constitutions.
Two or more indictments may be tried together when, as here, they "are based on the same act or transaction." R.R. 3:4-7, 3:5-6. Since the evidence which proved the rape included the evidence of the kidnapping, it was a proper exercise of the court's discretion to order the consolidation.
Although the consolidation of the two indictments was objected to, no defendant objected to the 11 being tried together, and none asked for a severance. However, defendants argue that the trial of all 11 together was "plain error."
The decision whether they were to be tried separately or together had to be made before the trial began. Not only was there no request for a severance, but there was nothing before the court at that time to indicate that a severance was necessary, or even that the defendants would have consented to separate trials. Cf. State v. Baum, 64 N.J.L. 410 (Sup. Ct. 1900). Nor did anything happen during the trial which demonstrates that it was plain error not to have ordered separate trials. State v. Johnson, 31 *418 N.J. 489, 505 (1960); State v. Rios, 17 N.J. 572 (1955); State v. Treficanto, 106 N.J.L. 344, 353 (E. & A. 1929).
Defendants contend that "the alleged asportation of complaining witness, if a separate indictable offense, falls within the purview of the abduction statute * * * rather than the kidnapping statute."
The essential facts that relate to this point are that C.J. and one or more of her girl friends had been at a party in Newark, in the neighborhood of which they had seen and spoken to one or more of the 11 defendants. As C.J. and her friends were walking on Springfield Avenue, on their way home, two automobiles occupied by the 11 defendants stopped. C.J. testified that "Leroy Johnson grabbed me from the back and he had the knife at my throat and he dragged me to this car which was parked against the curb and had my head down, and he asked me if I wanted to die. One of the boys inside said, `Hey, boy, throw her inside the car.' And that's what he did." She was driven to a parking lot where, she said, she was raped 11 times by the occupants of the two cars.
In State v. Dunlap, 61 N.J. Super. 582 (App. Div. 1960) this court sustained convictions of rape and kidnapping in circumstances similar to those at bar. We held, in effect, that rape and kidnapping are separate crimes even when the kidnapping is for the purpose of the rape. Defendants do not attack that holding. Their contention is that carrying off a woman against her will for the purpose of rape is abduction, punishable only under N.J.S. 2A:86-1 et seq., the abduction statute, and not under 2A:118-1, the kidnapping statute. For that proposition defendants rely upon Judge (now Chief Judge) Desmond's opinion for the three dissenters in People v. Florio, 301 N.Y. 46, 92 N.E.2d 881, 17 A.L.R.2d 993 (Ct. App. 1950). The State counters with the opinion in the same case written for the four man majority by Judge Conway.
Although both opinions in the Florio case are interesting and instructive, the answer to the question raised by defendants *419 here necessarily depends upon the construction of our own kidnapping and abduction statutes.
The forcible carrying away of a woman for the purpose of rape falls within the literal meaning of both statutes. However, it is neither impossible nor necessarily illegal for two or more statutes, because of overlapping, to define and punish the same act, even when that gives the State the right to proceed under either statute. State v. Fary, 16 N.J. 317, 321-325 (1954); State v. Labato, 7 N.J. 137 (1951). On the other hand,
"Where two criminal or penal statutes punish the same act it is the duty of the court, having due regard for other rules of construction, to construe the statutes in the manner most favorable to the accused. Therefore, when the later enactment is less harsh than the earlier one that should be deemed to repeal by implication the earlier one." State v. Brillo Mfg. Co., 63 N.J. Super. 287, 295 (App. Div. 1960).
Under the early English law, kidnapping and abduction were very clearly separate and distinct crimes. Blackstone tells us (Commentaries, Book IV, p. 208) that "forcible abduction * * * is vulgarly called stealing an heiress." It was a statutory crime "For," said he, "by statute 3 Hen. VII, c. 2, it is enacted that if any person shall for lucre take any woman, being maid, widow, or wife, and having substance either in goods or lands, [or] being heir-apparent to her ancestors, contrary to her will, and afterwards she be married to such misdoer, or by his consent to another, or defiled; such person, his procurers and abettors, and such as knowingly receive such woman, shall be deemed principal felons. * * *" Blackstone added that
"in the construction of this statute it hath been determined,  1. That the indictment must allege that the taking was for lucre; for such are the words of the statute. 2. In order to show this, it must appear that the woman has substance, either real or personal, or is an heir-apparent. 3. It must appear that she was taken away against her will. 4. It must also appear that she was afterwards married or defiled. And though possibly the marriage or *420 defilement might be by her subsequent consent, being won thereto by flatteries after the taking, yet this is felony, if the first taking were against her will; and so vice versa, if the woman be originally taken away by her own consent, yet if she afterwards refuse to continue with the offender, and be forced against her will, she may from that time as properly be said to be taken against her will as if she never had given any consent at all; for till the force was put upon her she was in her own power."
Kidnapping, on the other hand, was a common law crime, which Blackstone defined (p. 219) as "the forcible abduction or stealing away of a man, woman, or child from their own country and sending them into another. * * *"
We presume that, in Blackstone's time, if a woman had been taken forcibly from England into a foreign country, the Crown could have charged the taker with kidnapping or, if the necessary elements existed, abduction. In all other cases, the crimes were distinct.
The same clear distinction between the two crimes appeared in our first abduction and kidnapping statutes. In the "Act for the Punishment of Crimes" passed in 1796 (Paterson Laws of New Jersey, 1800, p. 208), section IX (p. 209) defined abduction. It eliminated the requirement that the woman have "substance," but otherwise it reflected the purpose behind the ancient English statute, for it provided that the abductee's marriage "shall be void; and also, the person to whom such woman shall be so married, shall not receive, take, hold, possess or enjoy any part of her estate, real or personal, by any gift, grant, bequest or devise, of, from, or under her. * * *" The penalty for abduction was imprisonment for not exceeding 12 years. Section LIV of the same act (p. 218) defined kidnapping (of those over 14 years of age) substantially as did Blackstone, including as a necessary element that the defendant "carry such man, woman or child from this state into another state or country."
For almost a hundred years the Legislature, it seems, considered abduction more serious than kidnapping, for the penalty for kidnapping was a fine not exceeding $1,000 or *421 imprisonment not to exceed five years, or both. Beginning in 1875 New Jersey apparently began to consider kidnapping more serious than abduction. In that year (L. 1875, c. 294, p. 51) the penalty for kidnapping was increased to a fine not to exceed $5,000 or imprisonment not exceeding 20 years, or both; and in 1898 the requirement that, to constitute kidnapping, the victim must be transported out of the State, was abolished by L. 1898, c. 235, § 114, p. 826. The latter change made the statute, in terms, broad enough to include forcible abduction. Cf. State v. Dunlap, supra. In 1907 (L. 1907, c. 55) the penalty for kidnapping was increased even further, to imprisonment for a minimum of five years, to life; in 1928 (L. 1928, c. 182) to a minimum of 30 years, to life; and in 1933 (L. 1933, c. 374), if the kidnapping be for ransom, to a mandatory life or death sentence, as fixed by the jury. In 1933 (L. 1933, c. 322, now N.J.S. 2A:118-2 and 2A:105-4) threatening or attempting to kidnap was made punishable by imprisonment for not more than 30 years, or by a fine of not more than $5,000, or both. Compare the severity of these statutes with N.J.S. 2A:86-2, which punishes abduction of a female "with intent to compel her by force * * * to be defiled," with a maximum of seven years or $2,000 fine, or both, and N.J.S. 2A:86-3, which provides that "any person who conveys or takes away an unmarried female, under the age of 18 years, with or without her consent * * * with intent to * * * carnally abuse her, or to use her for immoral purposes" is guilty only of a misdemeanor, unless "he marries her, without the consent of her father, mother, guardian or other person having her legal custody" in which case "he is guilty of a high misdemeanor." Note also that N.J.S. 2A:90-2 (assaults with intent) and 2A:94-1 (breaking and entering with intent) mention kidnapping but not abduction.
The abduction statute, on the other hand, has undergone little change since 1796, practically none since 1898, and none at all since 1921. See L. 1898, c. 235, § 116, p. 826; L. 1906, c. 65; L. 1910, c. 10; L. 1921, c. 22. None of *422 these changes are significant here, except as above noted. The abduction statute became chapter 86 and the kidnapping statute chapter 118 of Title 2A, by L. 1951, c. 344.
Defendants argue that the persistence of abduction and kidnapping as separate crimes, defined in separate statutes, proves that the Legislature meant to preserve the distinction between the crimes which existed in our early law, and did not intend to permit the prosecution of abduction for rape under the kidnapping statute. But see State v. Trosla, 4 N.J. Misc. 678, 679 (Sup. Ct. 1926). However, we find no evidence of any such intent in the various changes which broadened and toughened the kidnapping statute. Indeed, that very broadening and toughening negatives the idea that the Legislature gave any thought to being lenient to any specific type of kidnapping. That has been the construction of "Lindbergh laws" in other jurisdictions. 31 Am. Jur., Kidnapping, pp. 352-357; State v. Dunlap, supra. Whether this indiscriminate toughness, which makes all types of kidnapping punishable with a minimum sentence of 30 years, is too severe, is for the Legislature to decide.
We agree with defendants that abduction and kidnapping are still separate crimes, and that the kidnapping statute did not repeal any portion of the abduction statute by implication; but we are unable to agree that forcible abduction for the purpose of rape is excluded from the scope of the present kidnapping statute. Cf. State v. Trosla, 4 N.J. Misc. 678, 679 (Sup. Ct. 1926). If that were so, the State would have to prove in every kidnapping prosecution that the kidnapping was done with intent other than to rape or (in cases covered by N.J.S. 2A:86-3) to carnally abuse. Such a construction might encourage raping or carnally abusing the female victim of a kidnapping.
In short, we conclude that the abduction and kidnapping statutes merely overlap, and that the prosecution has the right to elect under which statute it will proceed, where the facts fit both. State v. Fary, supra. However, *423 the mandatory minimum of 30 years for kidnapping places upon the prosecution the moral obligation not to indict under this statute unless the crime warrants such severe punishment. Note, for example, that the taking of a child by one parent from the custody of the other may be kidnapping. 31 Am. Jur., supra, p. 353; In re Kelsey, 19 N.J. Misc. 488 (C.P. 1941). And see United States v. Parker, 103 F.2d 857 (3 Cir. 1939), certiorari denied 307 U.S. 642, 59 S.Ct. 1044, 83 L.Ed. 1522 (1939) in which defendants were convicted of kidnapping one Wendel to induce him to confess to the kidnapping of Charles A. Lindbergh, Jr. to save Bruno Richard Hauptmann. Under the New Jersey statute they would have received a minimum penalty of 30 years. The federal act, however, is not so severe.
Defendants contend that their motions for acquittal at the end of the State's case and at the conclusion of the entire case should have been granted, and that the verdict was the result of mistake, partiality, prejudice or passion. It would serve no useful purpose to review the voluminous testimony. We have examined it in detail, and we find no error in the denial of the motions. We find, further, that the evidence before the jury supports the verdict.
Defendants also contend that it was prejudicial error to admit in evidence their confessions and certain other testimony. We find no such error.
Finally, the defendants Pugsley, Cowan and Leroy Johnson, who were sentenced to consecutive terms for rape and kidnapping totalling 50 to 65 years, contend that their sentences are flagrantly excessive  so much so, indeed, that they constitute cruel and unusual punishment "proscribed by the N.J. Constitution, Article I, Section XII and the U.S. Constitution, Amendment 8."
These three defendants contend that, even assuming rape and kidnapping are separate crimes, the kidnapping was a mere incident of the rape, and it was an "abuse" of the court's discretion to impose consecutive rather than concurrent *424 sentences. Although C.J. was a virgin, only 17 years old, the circumstances of this brutal rape were no more heinous than in State v. Dunlap, supra, 61 N.J. Super. 582; yet in that case the sentences were concurrent.
The fractionalization of offenses has become an increasingly serious problem, in direct ratio to the proliferation of criminal statutes. See, for example, the note "Consecutive Sentences In Single Prosecutions: Judicial Multiplication Of Statutory Penalties," 67 Yale L.J. 916 (1958); Kirchheimer, "The Act, the Offense, and Double Jeopardy," 58 Yale L.J. 513 (1949). Said note, in substance, suggests that when more than one statute is violated, courts should consider the social norms intended to be vindicated by the several statutory provisions, and, when all of the facts that constitute all of the crimes charged in reality constitute only a single episode and violate only a single one of those norms, consecutive sentences should not ordinarily be imposed, particularly when the number of charges is the result of the prosecution's optional choice of statutes and counts, which made several offenses out of a single transgression. In some states, statutes forbid separate consecutive sentences upon each legal fragment of what is in reality only one offense. Cf. People v. Savarese, 114 N.Y.S.2d 816 (Cty. Ct. 1952). See also Ferguson, "Formulation of Enforcement Policy: An Anatomy Of The Prosecutor's Discretion Prior To Accusation," 11 Rutgers L. Rev., 507, 511 (1957).
This brings us face to face with the question whether this court has the power to modify the sentence imposed by the trial court. The question might rather be put in this fashion: Why has it been assumed that this court has no such power?
The quantum of sentence (within the limits fixed by statute) is within the discretion of the sentencing judge. In early days, it was well nigh impossible to review any exercise of discretion by a trial judge. State v. Valentina, 71 N.J.L. 552, 556 (E. & A. 1905). This wall was gradually *425 eroded by statute (State v. Valentina, supra; R.S. 2:195-16) and by case law. Compare, for example, Clark v. State, 57 N.J.L. 489 (Sup. Ct. 1895), affirmed 58 N.J.L. 383 (E. & A. 1895), with State v. Pometti, 23 N.J. Super. 516 (App. Div. 1952), affirmed 12 N.J. 446 (1953). Laying aside the question of sentence for the moment, we recall no exercise of discretion which today is not reviewable and which, if unlawfully prejudicial or "abused," may not be corrected by an appellate court. Cf. Borough of Fanwood v. Rocco, 59 N.J. Super. 306, 315 (App. Div. 1960), affirmed 33 N.J. 404 (1960); "The Abuse of Discretion Formula," 78 N.J.L.J. 321, 325 (1955). The spirit of our new practice is to allow every litigant one trial, and one appeal as a matter of right in which all prejudicial error may be reviewed and corrected. As a corollary, the appellate courts have original jurisdiction to do all that needs to be done to accomplish justice, save in those cases in which a jury trial must be had to correct an error. It would therefore be an anachronism if it were true today that no appellate court may review a trial judge's exercise of his discretion in sentencing.
However, anachronisms do persist in the law, and if one is very deeply imbedded the shock or damage caused by digging it out may outweigh the advantages of adopting a new and reasonable rule. That is not the situation here, for we find that the idea of the non-correctability of sentences dates, in New Jersey, only from 1875; that it was an historical accident, based not upon reason, but upon authority which our Supreme Court has repudiated; and that it has never been accepted as an absolute by our highest court and only once by our intermediate appellate courts.
The first case in which the question of the correctability of a sentence arose in New Jersey was State v. Gray, 37 N.J.L. 368 (Sup. Ct. 1875). In that case defendant had been sentenced to "imprisonment, at hard labor, in the state prison for the term of six months," for adultery. The court held that a defendant could not be sentenced to the *426 State Prison, under the statute then existing, for that offense. Then, following early English and American cases, the Supreme Court held that neither it nor the trial court had power to impose a new sentence, and that the defendant must therefore go free. The court arrived at that surprising conclusion as follows (p. 371):
"The writ of habeas corpus, in this case, does not bring up the record of the proceedings and judgment below for review; it operates only on the body of the defendant and raises the single question whether he is legally in custody.
This court may, as has been done in this case, award a certiorari to produce the record for its inspection, but it has no power to reverse the judgment of the inferior jurisdiction; it can simply declare that by virtue of the sentence, if manifestly illegal, the defendant cannot be longer restrained of his liberty. The court which rendered the judgment cannot vacate it, or render a new judgment after the term at which it was pronounced is ended, or the judgment is executed, and the punishment partly borne.
The judgment subsisting, but being illegal and void, it is no warrant for retaining the defendant in custody, and it seems clear that no new judgment can be passed in this court or the court below."
This ridiculous doctrine, the product of the technicalities of the day, persisted and was "complacently" followed in State v. Addy, 43 N.J.L. 113 (Sup. Ct. 1881), and Roop v. State, 58 N.J.L. 487 (Sup. Ct. 1895). See State v. Culver, 23 N.J. 495, 507 (1957). Cf. Bindernagle v. State, 61 N.J.L. 259, 267, 269 (E. & A. 1897). During the period in which this doctrine prevailed, that the appellate courts had no jurisdiction to revise a sentence but only to declare one "manifestly illegal," i.e., beyond the limits of the statute, it was obviously useless to appeal from a sentence on the ground that it was merely excessive; hence no such appeals were taken.
It was not until 1898 that the situation created by State v. Gray was corrected. By L. 1898, c. 237, § 144, p. 916, R.S. 2:195-23, it was provided that "Whenever a final judgment in any criminal case shall be reversed upon a writ of error, on account of error in the sentence, the court in *427 which the reversal was had may render such judgment therein as should have been rendered, or may remand the case for that purpose to the court before which the conviction was had." This statute was construed to apply where the sentence was "manifestly illegal" (Cf. In re Marlow, 75 N.J.L. 400, 402 (Sup. Ct. 1907)), but we find no case in which the question was raised whether this statute empowered an appellate court to entertain an attack upon the sentence as an "abuse" of discretion.
No reason has been suggested to us, other than historical assumptions and meagre precedent, why there should not be review of sentences. All writers upon the subject agree that reason and justice demand that there should be. In State v. Mull, 30 N.J. 231, at p. 239 (1959), the Supreme Court collected some of the authorities and pointed out "it has been said there are increasingly hopeful signs indicating some erosion in the general `doctrine of non-reviewability.'" See also Livingston Hall, "The Reduction of Criminal Sentences On Appeal," 37 Colum. L. Rev. 521 (1937); "Due Process and Legislative Standards In Sentencing," 101 U. Pa. L. Rev. 257 (1952).
In State v. Culver, 23 N.J. 495 (1957), the Supreme Court was sharply critical of State v. Gray. Although the problem before the court in Culver differed from the one at bar, what the court said there is pertinent here. It declared (p. 509):
"[T]here seems to have been no sound reason for the court in State v. Gray, supra, to have adopted that * * * strict view, and an analysis of the cases would seem to indicate that on other occasions, the courts of New Jersey, while appearing to be in agreement with the rule of the Gray case, have silently adopted and followed the rule of the [contra] greater weight of authority. * * *"
In any event, said the Supreme Court (p. 510):
"Certainly, time itself has indicated that the tide has run against the view taken in State v. Gray, supra. As long ago as 1609, in Milborn's case, 7 Coke 7a (K.B. 1609), Lord Coke stated that *428 the reason for the law is the soul of the law, and if the reason for a law has changed, the law is changed. More recently, Mr. Justice Holmes said:
`It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' Collected Legal Papers 187 (1920).
Blind imitation of the past is what we find as the basis for the holding in State v. Gray, supra."
At pp. 505-506, the court said (emphasis ours):
"[I]t is unquestionable that the Legislature clearly intended that resentencing was to be governed by rules of court.
Nor can it be said, apart from any statutory considerations, that our courts, according to present-day concepts and standards, are without power to correct an illegal or improper sentence. One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his Interpretations of Legal History (1922) when he stated, `Law must be stable, and yet it cannot stand still.' And what has been done in the past is but one of the factors determinative of the present course of our law  a truism which has not gone unrecognized among the great thinkers of the legal profession. Thus, Mr. Justice Holmes recognized that:
`To rest upon a formula is a slumber that, prolonged, means death'; Collected Legal Papers 306 (1920).

* * * * * * * *
But this is no new doctrine. The last words in Coke's Fourth Institute, his last and greatest work, expressed the same thought:
`And we will conclude with the aphorism of [Edmund Plowden] the great lawyer and sage of the law (which we have heard him often say) Blessed be the amending hand.'
The factors to be weighed in the balance in determining the present course of the law include the reasons for the rule, the present requirements of the environment in which the rule is to be applied, the dangers incident to any change and the evils resulting from its continuance. The power of growth is inherent in the common law."
*429 At pp. 509-510 the court quoted the following from Patterson v. State, 48 N.J.L. 381, 383 (Sup. Ct. 1886):
"`In our time a more humane system of criminal law has been adopted, which graduates the punishment according to the magnitude of the offence, and in which there is nothing to shock our sense of justice.'"
It follows that we should be astute to root out those anachronisms which would subvert our "more humane system of criminal law * * * which graduates the punishment according to the magnitude of the offence" and "to avert from the prisoner a punishment so disproportionate to his crime" as to "shock our sense of justice."
It is noteworthy that only one New Jersey case, State v. Newman, 128 N.J.L. 82, 88 (Sup. Ct. 1942), has stated that an appellate court may not revise an excessive sentence. On the other hand, later cases have been careful to say that ordinarily a sentence will not be revised if it is within statutory limits. For example, in State v. Benes, 16 N.J. 389, 396 (1954), Justice Brennan (now of the United States Supreme Court) said (emphasis ours):
"A judgment of sentence is not ordinarily revisable by an appellate court where the sentence is within authorized statutory limits. In re Lewis, 11 N.J. 217 (1953). There is no showing here to bring the case outside the general rule."
In the Lewis case, 11 N.J., at p. 224, the court said "such a judgment is not ordinarily revisable by an appellate court." See, also, State v. Elliott, 13 N.J. Super. 432, 435 (App. Div. 1951); In re Scridlow, 124 N.J.L. 342, 344 (Sup. Ct. 1940).
In State v. Ivan, 33 N.J. 197 (1960), the defendant had pleaded non vult to an indictment for bookmaking. He was sentenced to a term of one to two years and fined $5,000, and he appealed. The sole ground of his appeal was that the sentence was "illegal" because "the trial judge had a pre-conceived policy [that] offenses of that kind merit *430 the sentence imposed without regard to the circumstances of the individual offender." The sentence, and that alone, was reviewed by the Supreme Court, which reviewed those circumstances, and the pre-sentence report, and concluded (p. 203) "[W]e affirmatively agree with [the trial judge's] exercise of his discretion."
In State v. Pohlabel, 61 N.J. Super. 242 (App. Div. 1960), defendant had moved "to vacate an allegedly illegal and improper sentence," entered upon his plea of non vult. The sole ground of the motion was that the trial judge "in imposing sentence, misapprehended the contents of a pre-sentence report." We examined the pre-sentence report and the statements of the judge at sentencing and concluded that the judge had in fact misunderstood the defendant's previous record. We set aside the sentence and remanded the case to the trial judge for re-sentencing, holding (p. 251) that "it is the function and the positive duty of the court to correct an `illegal sentence' and the power is exercisable `at any time.'" We held that where the sentencing judge acted under material misapprehensions of fact as to the defendant's criminal record and prejudice probably resulted, the sentence was "illegal." We conceive that the same rule applies where the sentence is manifestly excessive under the particular facts, even though within authorized statutory limits.
In Montalto v. State, 51 Ohio App. 6, 199 N.E. 198, at page 200 (Ct. App. 1935), the court set aside a sentence and remanded the cause to the trial court for resentence, saying:
"There are jurisdictions in the United States where the discretion of the trial court to fix the penalty within the limits prescribed will not be reviewed by the higher courts, and there are other jurisdictions where reviewing courts will determine whether there has been an abuse of that discretion, and, if there has been, will afford relief against the same.
While the rule generally applied may be that a reviewing court will not disturb a sentence as excessive, provided it is within the limits prescribed by law, and there is nothing in the record to show that *431 it was not the result of the exercise by the trial judge of the discretion vested in him to determine the penalty (within the limits fixed) which should be assessed, we hold that, if the sentence appears to be very much greater than the proper protection of society demands, and the record justifies the conclusion that the sentence was probably the result of prejudice rather than the exercise of a sound discretion, a reviewing court has the power to relieve against the excessiveness of the sentence, which may be accomplished by either modifying and reducing it, or by setting the same aside and remanding the cause for resentence."
In the article "Appellate Review Of Primary Sentencing Decisions: A Connecticut Case Study," 69 Yale L.J. 1453 (1960) it is pointed out that 11 states now have some system of review of sentences. Of these 11, nine vest the power in their existing appellate courts, while Massachusetts and Connecticut have created special tribunals outside their judicial structures and have authorized them to affirm, reduce, or increase sentences on appeal. Since 1907 the English Court of Criminal Appeal has been empowered to reduce, increase, or change the type of punishment imposed. "An Act To Establish A Court of Criminal Appeal * * *," 1907, 7 Edw. 7, c. 23, § 3(c); see Vanderbilt, "Work of England's Court of Criminal Appeal," 12 Wash. L. Rev. 52 (1937).
The cases cited in the annotations in 29 A.L.R. 313 (1924) and 89 A.L.R. 295 (1934), and the cases subsequent thereto, show that some states have held that the right to affirm, reverse, or modify judgments includes the right to revise sentences.
Our Supreme Court held, in Culver, supra, 23 N.J., at p. 502,
"That matters of sentence or the correction of sentences relate to procedure admits of no doubt. In In re Hardman, 131 N.J.L. 257, 258 (Sup. Ct. 1944), the court said:
`The purpose of a trial of an indictment is to ascertain the truth of the charge and the protection of society from evil doers. The sentencing is an incident and seems procedural or directory rather than mandatory, and the trial court has wide discretionary power in performing that duty.'
*432 The striking of the provisions of old Title 2 relating to the correction of illegal or improper sentences was highly significant legislative recognition that such matters fall within the realm of procedure."
We conclude, therefore, that we have the right to revise a sentence where it is manifestly excessive, even though within authorized statutory limits.
We have examined the presentence reports of all four defendants.
Leroy Johnson, sentenced for rape and kidnapping, was 19 years old at the time of the offense. He was born out of wedlock. His mother was dissolute, had other illegitimate children by various fathers, and had been incarcerated at least twice. Other of her children were in institutions, one daughter being in Clinton Reformatory.
The report tells us that as a child he lived sometimes with the mother, sometimes with the father, and sometimes with both, but at all times "in a highly delinquent community * * * inhabited predominantly by colored families." In 1953 he was living with his father "in rather primitive conditions."
Defendant was "a constant behavior problem in school, being expelled in 1952, while in the sixth grade. He was academically retarded and incorrigible." He appeared in Juvenile Court for the first time in January 1952, when he was 12, on a charge of larceny. In September 1952 he was again before the Juvenile Court, this time "for assaulting 10 year old girl with a stone" and placed on probation. In January 1953, at the age of 13, he was committed to the State Home for Boys at Jamesburg for "violation of probation  incorrigibility." An early report says "subject is the product of a loose, immoral woman and a disinterested father, who have been more concerned with their own affairs than provide [sic] any understanding or affection for subject."
In September 1954, after 20 months at Jamesburg, he escaped but was caught and returned. He was then transferred *433 to Annandale. He became increasingly unmanageable at Annandale and, in July 1956, he was transferred to Bordentown. He was paroled from Bordentown in May 1958, thus having spent more than five years in custody. Two months later he was jailed again (with his cousin, the defendant Pugsley, who was with another girl) for ten days for having intercourse with a 16-year-old delinquent; shortly thereafter for ten more days for assault and battery; and finally, a month before the rape (which occurred on November 1, 1958), he was arrested for loitering but not sentenced to jail. In short, he had spent nearly all of his life, from age 13 to the time of the rape, in jail.
Pugsley was 20 years old at the time of the rape. He was an unskilled worker, of low intelligence, but the owner of a coffee shop who had laid him off for lack of work after seven months employment reported that he considered him of good character and would reemploy him. Pugsley, too, was the son of a dissolute mother, and was brought up in a "highly delinquent slum area." For a time his mother had been confined in Clinton Reformatory. Pugsley's parents separated when he was six years old, and from the time he was eight he lived with his grandmother, as did two other children of his mother. Four others were placed elsewhere by the State Board of Child Welfare. Still another was in the Clinton Reformatory.
Pugsley first appeared in the Juvenile Court in April 1955 for assault, and was placed on probation. In July 1955 he was committed to the Detention Home for one week for violation of his probation. In September 1955, when he was about 17 years old, he was sent to Annandale for stealing an automobile, in which he had taken four juveniles for a ride. He was paroled from Annandale in 1956. In April 1958 he was fined $10 for assault and battery. In July 1958 he was arrested, as we have mentioned, with Leroy Johnson, for having intercourse with his 14-year-old "girl friend" and jailed for ten days.
*434 The presentence report concludes "subject was a product of his environment, which includes neglect by his mother and rejection by his father."
John Cowan was 21 at the time of the offense. He comes from a good, hard working family, and he himself had a good work record. He was educated as far as first year high school. He is married, has two children, and worked as an express company helper until his conviction, his parents having put up $10,000 bail for him after his arrest. C.J. was unable to identify Cowan as one of those who raped her, and he was convicted almost entirely upon the confession which he gave the police, which he repudiated at the trial.
Cowan's contact with the criminal law began in 1951, at the age of 12, when he appeared in Juvenile Court because he was in the habit of approaching women on the street to "put his arm around their waist * * * feel his victims' breasts, and then walk away." In 1953, when he was about 14 years old, he was surprised while a "peeping Tom" and shot in the foot when he fled. He was sent to the State Home For Boys in Jamesburg from which he was paroled after nine months, in 1953. His parole expired long before the rape, and he was not involved with the law again until the rape.
All four defendants were examined at the Menlo Park Diagnostic Center, which reported that none of them came under the Sex Offenders Act. The Menlo Park reports reveal nothing which justifies the consecutive sentences.
Our examination of all of the testimony and the presentence reports satisfies us that the consecutive sentences imposed upon Leroy Johnson, Thornton Pugsley and John Cowan were manifestly excessive. Since the minimum sentences on the kidnapping convictions had to be 30 years, the sentences for rape should have been made concurrent. Those three sentences are accordingly so modified.
We have also reviewed the sentence imposed upon defendant James Johnson, and find that is not so manifestly excessive as to warrant our changing it.
*435 Except as modified, the judgments are affirmed. The case has been handled by both assigned counsel with the zeal that is characteristic of members of the Bar who represent indigent defendants. In addition, we wish to note that both counsel presented the matter, in their briefs and oral arguments, with exceptional ability.